COLLIER & BASIL P.C.
Robert Basil, Esq.
1270 Broadway, Suite 305
New York, NY 10001
(917) 512-3066
Attorney for Plaintiff

MOTLEY RICE LLC
Mary Schiavo, Esq.
Donald L. McCune, Jr., Esq.
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
(843) 216-9138
Attorney for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
## NEWARK DIVISION

### CASE NO.: _____

| | |
|---|---|
| **GINEVRA GALLAZZI**, Individually, and as Administrator ad Prosequendum of the Estate of **FABIO GALLAZZI**, Deceased,<br><br>Plaintiff,<br><br>vs.<br><br>**LIBERTY HELICOPTERS, INC.**, a New Jersey corporation; **MERIDIAN CONSULTING I CORPORATION, INC.**, a New Jersey Corporation; **THE ESTATE OF STEVEN M. ALTMAN,** a Pennsylvania Estate; and **LCA PARTNERSHIP,** a Pennsylvania Partnership,<br><br>Defendants. | **COMPLAINT FOR DAMAGES**<br><br>**WRONGFUL DEATH AND SURVIVAL ACTION**<br><br>**JURY DEMAND** |

COMES NOW Plaintiff, GINEVRA GALLAZZI, a resident of Bazzano, Italy,

in care of Motley Rice LLC, 28 Bridgeside Blvd., Mount Pleasant, SC 29464 by and

through undersigned counsel and for her cause of action files this Complaint

against Defendants:

LIBERTY HELICOPTERS, INC. ("LIBERTY")
P.O. Box 1338
Linden, New Jersey 07036

MERIDIAN CONSULTING I CORPORATION, INC. ("MERIDIAN")
PO Box 1338
Linden, New Jersey  07036

THE ESTATE OF STEVEN A. ALTMAN ("ALTMAN")
C/O Franklin F. Bass
Locke Lord Bissell & Liddell
3 World Financial Center
New York, NY 10281

LCA PARTNERSHIP ("LCA")
240 New York Dr. Suite 1
Ft. Washington, Pennsylvania  19034

and alleges on information and belief:

## JURISDICTION AND VENUE

1.    This is an action for damages in excess of $75,000, exclusive of interest, costs, and attorneys fees.

2.    Jurisdiction exists over this action under 28 U.S.C. § 1332 because the matter in controversy exceeds the sum of $75,000 and the controversy is between citizens of the United States and a citizen of a foreign state.

3.    Venue is proper under 28 U.S.C. § 1391 because a substantial part of the events giving rise to this claim occurred in this judicial district.

4.    All conditions precedent to bringing this action have been met.

## PARTIES

5.    At all times material hereto, Plaintiff was and is a resident of Italy.

6.    At all time material hereto, DECEDENT FABIO GALLAZZI ("DECEDENT") was a resident of Italy who died intestate.

7.    At all times material hereto, Plaintiff was and is the Administrator ad Prosequendum of the Estate of FABIO GALLAZZI.

8.    At all times material hereto, Defendant LIBERTY HELICOPTERS, INC., was a New Jersey corporation with headquarters at Linden, New Jersey, that was certified as an air carrier pursuant 14 C.F.R § 135 and operated the Eurocopter AS350-BA Helicopter, registration N401LH ("EUROCOPTER"), in which the DECEDENT was a fare-paying passenger and which collided in mid-air with a fixed-wing aircraft, killing the DECEDENT.

9.    At all times material hereto, Defendant MERIDIAN CONSULTING I CORPORATION, INC. was a Delaware corporation with a registered agent located in West Trenton, New Jersey, that owned the EUROCOPTER and (as a principal) allowed LIBERTY (as an agent) to operate the EUROCOPTER for the carriage of fare-paying passengers pursuant to 14 C.F.R. § 135.

10.    At all times material hereto, the ESTATE OF STEVEN M. ALTMAN is a Pennsylvania estate that holds the assets of Steven M. Altman, deceased (ALTMAN), who was the operator of a Piper PA-32R-300 aircraft, registration N71MC (PIPER), which collided with a helicopter in which the DECEDENT was a fare-paying passenger.

11.    At all times material hereto, LCA PARTNERSHIP was a Pennsylvania partnership that owned the PIPER operated by ALTMAN that collided with the

EUROCOPTER operated by LIBERTY. All Partners of LCA PARTNERSHIP are Citizens of the United States or otherwise diverse from Plaintiff.

12.    At all times material hereto, the Federal Aviation Administration (FAA) was a United States governmental entity charged with ensuring safe air transportation by formulating, enacting, and enforcing safety standards that apply to air operations.

13.    Among the duties of the FAA is to supply, through it employees and/or agents, flight following and monitoring in accordance with the FAA internal procedures set out in FAA Order JO 7110.65, titled Air Traffic Control.

14.    The FAA, through its employees and agents, provided flight following and monitoring during the accident flight.

## ALLEGATIONS COMMON TO ALL COUNTS

15.    This claim is made on behalf of Decedent FABIO GALLAZZI (DECEDENT) who was killed in a mid-air collision over the Hudson River on August 8, 2009.

16.    This claim is also made on behalf of all the lawful heirs and beneficiaries of the DECEDENT who was killed in a mid-air collision over the Hudson River on August 8, 2009.

17.    At the time of the accident, the sky was clear and the visibility was ten (10) miles.

18.    At the time of the accident Visual Flight Rules (VFR) were in effect.

19.    The DECEDENT was a fare paying passenger aboard a Eurocopter AS350 BA helicopter, registration N401LH (the "EUROCOPTER") and operated by LIBERTY HELICOPTERS, which was conducting a sightseeing tour of the New York City area along the Hudson River.

20.    The EUROCOPTER in which the DECEDENT was a passenger collided with a fixed wing aircraft, a Piper PA-32 ("PIPER"), registration N71MC and operated by MR. STEVEN ALTMAN.

21.    The EUROCOPTER departed from the West 30th Street Heliport in New York City, New York, at approximately 11:52 A.M. EDT.

22.    The EUROCOPTER pilot did not file a flight plan for the flight.

23.    The PIPER departed Teterboro Airport in Trenton, New Jersey, (TEB) at approximately 11:49 A.M. EDT.

24.    The PIPER pilot did not file a flight plan for the flight.

25.    However, the PIPER pilot contacted the TEB clearance delivery and requested a departure clearance from TEB to Ocean City, New Jersey at an altitude of 3000 feet, and requested VFR flight following for the trip.

26.    Pursuant to 14 C.F.R. § 91.131, to operate in the "Class B" airspace in the that surrounds the New York metropolitan area, a pilot must have Air Traffic Control (ATC) clearance to enter the airspace and comply with ATC instructions at all times when operating in the airspace.

27.    Because the base of the "Class B" airspace in the busy Hudson River corridor is 1100 feet, the PIPER pilot's requested climb to 3000 feet required

coordination between the TEB air traffic controllers and the Newark Liberty International Airport (EWR) controllers

28.    When taxiing for departure from TEB, the TEB local controller (LC) asked the PIPER pilot if he would like to climb straight out, or proceed down the Hudson River.

29.    The PIPER pilot elected to proceed down the Hudson River.

30.    The PIPER departed TEB and the LC assigned the PIPER an altitude of 1100 feet, presumably to keep the PIPER below the "Class B" airspace and thus avoiding having to coordinate the higher requested altitude with the EWR controllers.

31.    The TEB LC later cleared the PIPER pilot to join the Hudson River southbound.

32.    At this time, there were several potential traffic conflicts between the PIPER and other traffic along the Hudson River.

33.    The TEB LC never warned the PIPER pilot about these potential conflicts.

34.    At no time did the TEB LC coordinate with the EWR air traffic controllers to coordinate the PIPER pilot's request to climb to 3000 feet.

35.    After the PIPER turned south to follow the Hudson River, the EUROCOPTER and the PIPER were on converging flight paths.

36.    At or about 11:52:19 A.M. the TEB LC instructed the PIPER pilot to contact EWR tower for further clearance.

37.    At or about 11:52:19 A.M. the EWR radar controller asked the TEB LC to assign a 220 degree heading to the PIPER to avoid the converging EUROCOPTER.

38.    The PIPER pilot acknowledged the radio frequency change, but did not ever contact the EWR tower.

39.    Upon information and belief, the PIPER pilot read back an erroneous frequency to the TEB LC.

40.    The TEB LC never corrected the erroneous frequency read-back from the PIPER pilot.

41.    At this time the PIPER was at 1100 feet, heading towards the Hudson River where a right turn would align it with the west shore of the Hudson travelling southbound.

42.    At this time the EUROCOPTER was climbing to 1100 feet and heading for the west shore of the Hudson River to follow it southbound.

43.    Shortly after 1153 A.M. the PIPER and EUROCOPTER collided, resulting in the crash of both aircraft and the death of nine (9) people, including the DECEDENT.

44.    At all times relevant to this accident, the TEB tower was authorized to be staffed with five (5) air traffic controllers.

45.    At all times relevant to the accident, there were only two (2) controllers working in the TEB tower cab.

46.    At all times relevant to the accident, two (2) TEB assigned controllers were on break.

47.    At all times relevant to the accident, the manager of the shift had left the TEB premises, informing no one of his whereabouts and was unable to be reached even after the accident by cell phone.

48.    From two (2) minutes after he cleared the PIPER for takeoff, and continuing through the time of the accident, the TEB LC was conducting a conversation unrelated to his air traffic control duties and in derogation of his responsibilities to provide VFR flight following as requested by the PIPER pilot and mandated in FAA Order 7110.65.

49.    At all times relevant to this accident, the shift supervisor was unavailable to provide monitoring and situational awareness in the TEB tower cab, including monitoring of potential traffic conflicts and monitoring and policing of the unauthorized and non-business related conversations that the TEB LC engaged in during the whole of the accident sequence.

50.    The FAA knew, should have known, or in the exercise of reasonable care, would have known, that the procedures for controlling traffic in the busy Hudson River corridor, were antiquated, ineffective, and bound to result in hazardous conditions for those traversing the corridor.

51.    The FAA knew, should have known, or in the exercise of reasonable care, would have known, that by failing to update and revise the ATC procedures for operating in the Hudson River corridor, it was reasonably foreseeable that

persons in aircraft operating in the Hudson River Corridor, including the DECEDENT, would face an unreasonable risk of personal injury or death.

52.    Despite the fact that the FAA knew, should have known, or in the exercise of reasonable care, would have known, that the procedures for controlling traffic in the busy Hudson River corridor were antiquated, ineffective, and hazardous, the FAA failed to act to correct such hazards until the death of nine (9) people, including the DECEDENT, prompted them to do so.

53.    The failure of the FAA to timely correct known inadequacies in the procedures for flying the Hudson River corridor was the proximate cause of the death of the DECEDENT and the damages sustained thereby.

54.    The TEB tower supervisor's behavior was negligent, grossly negligent, reckless and wanton, in that the TEB tower supervisor:

  a.) Intentionally abandoned his duty position when not authorized to do so;

  b.) Abandoned his duty position to conduct personal business on government time;

  c.) Failed to inform other FAA employees of his whereabouts during his absence to perform personal errands;

  d.) Failed to monitor the traffic situation in the TEB vicinity during his absence; and

  e.) Failed to supervise and correct the TEB LC who was on a personal call during the entirety of the accident sequence

instead of devoting his time efforts and attention to the air traffic control responsibilities.

55.    The TEB tower supervisor's negligent, grossly negligent, reckless and wanton behavior was the proximate cause of the death of the DECEDENT and the damages sustained thereby.

56.    The TEB LC's behavior was negligent, grossly negligent, reckless and wanton, in that the TEB LC:

    a.)    Due to laziness, inattention or distraction, failed to provide the VFR flight following requested by the PIPER pilot un compliance with the strictures of FAA Order 7110.65;

    b.)    Due to laziness, inattention or distraction, failed to provide coordination with the EWR controllers to permit the PIPER pilot operate in the "Class B" airspace as requested;

    c.)    Due to laziness, inattention or distraction, failed to timely hand the PIPER pilot off to EWR controllers;

    d.)    Due to laziness, inattention or distraction, failed to detect an improper frequency read back by the PIPER pilot during the belated hand off to EWR; and

    e.)    During the entirety of the accident sequence, carried on an inappropriate, non-business related personal

conversation while simultaneously and ineffectively acting as the sole controller on watch in the TEB tower, in derogation of his duties to the flying public, and in particular, those nine (9) who perished that day, including the DECEDENT.

57. The TEB LC's negligent, grossly negligent, reckless and wanton behavior was the proximate cause of the death of the DECEDENT and the damages sustained thereby.

58. As a common carrier, LIBERTY was obligated to provide the highest degree of care in the maintenance and operation of the aircraft, a dangerous instrumentality, while under its control. In this respect, LIBERTY owed the highest degree of care to all persons aboard the accident aircraft.

59. LIBERTY was responsible for the safe and proper maintenance of the aircraft, for the safe and proper operation of the aircraft during its flight, and for the proper training, currency and rest requirements of the flight crew.

60. LIBERTY breached its duty of care by willfully, wantonly, recklessly, and negligently failing to operate and maintain the subject aircraft in a safe and airworthy manner.

61. The pilot of the LIBERTY EUROCOPTER negligently, carelessly, and recklessly failed to adhere to Federal Aviation Regulation (FAR) 14 C.F.R. § 91.113(b), which states, "[w]hen weather conditions permit, regardless of whether an operation is conducted under instrument flight rules or visual flight rules,

vigilance shall be maintained by each person operating an aircraft so as to see and avoid other aircraft."

62.    The pilot of the LIBERTY EUROCOPTER negligently, carelessly, and recklessly failed to adhere to Federal Aviation Regulation (FAR) 14 C.F.R. § 91.111(a) which states, "no person may operate an aircraft so close to another aircraft as to create a collision hazard."

63.    FABIO GALLAZZI, Deceased, was at all times material herein, a passenger on the accident flight, and was killed by the willful, wanton, reckless, and negligent misconduct of LIBERTY.

64.    ALTMAN had a duty to foreseeable third parties, such as the DECEDENT, to educate himself about and to follow the operating procedures for air traffic control in the New York City area Class "B" airspace.

65.    Upon information and belief, ALTMAN did not properly follow the procedures for entering and operating in the Hudson River class "B" airspace, in that he failed to monitor the Common Traffic Advisory Frequency (CTAF), and failed to keep a proper lookout for other aircraft.

66.    ALTMAN, pilot of the PIPER, negligently, carelessly, and recklessly failed to adhere to Federal Aviation Regulation (FAR) 14 C.F.R. § 91.113(b), which states, "[w]hen weather conditions permit, regardless of whether an operation is conducted under instrument flight rules or visual flight rules, vigilance shall be maintained by each person operating an aircraft so as to see and avoid other aircraft."

67.    ALTMAN, pilot of the PIPER, negligently, carelessly, and recklessly failed to adhere to Federal Aviation Regulation (FAR) 14 C.F.R. § 91.111(a) which states, "no person may operate an aircraft so close to another aircraft as to create a collision hazard."

68.    LCA, the owner of the PIPER, a dangerous instrumentality, permitted ALTMAN, a negligent, reckless and careless operator, to fly the PIPER.

69.    LCA failed to ensure that ALTMAN operated the PIPER in a safe and prudent manner.

70.    As a result of the aforementioned negligence of the Defendants, and each of them, and of the negligence of Federal Aviation Administration employees, including but not limited to the TEB Tower Supervisor, the TEB air traffic controller on duty, and the FAA employees responsible for managing the design of the air traffic control system in the New York City metropolitan airspace, FABIO GALLAZZI was killed.

71.    The Plaintiff has filed an administrative claim against the FAA for damages caused by the FAA in this action and is awaiting disposition of that administrative claim before proceeding judicially against the FAA.

<u>COUNT I</u>
<u>NEGLIGENCE AGAINST LIBERTY AND MERIDIAN</u>

72.    Plaintiff incorporates by reference all prior allegations above as if fully set forth herein.

73.    At all times material, MERIDIAN was the owner of the helicopter, a dangerous instrumentality.

74.    At all times material, MERIDIAN permitted LIBERTY to operate the helicopter, a dangerous instrumentality.

75.    At all times material hereto, MERIDIAN had a duty to ensure that LIBERTY operated the helicopter in a safe and prudent manner.

76.    At all times material Defendant LIBERTY owed a duty to all persons aboard the accident helicopter to operate and control the accident helicopter, on the ground and in the air, with the highest degree of care, and to exercise the highest degree of care to prevent injury of any kind, including injury and death as a result of known dangers posed by an improperly operated helicopter.

77.    The air crash which occurred on August 8, 2009, and which resulted in the deaths of all on board, was a direct and proximate result of the negligence and willful misconduct alleged herein of Defendants MERIDIAN and LIBERTY.

78.    Defendants MERIDIAN and LIBERTY by and through their agents, employees, and representatives, willfully and otherwise breached the duty owed to DECEDENT in some or all of, but not limited to, the following regards:

    a.)    By negligently entrusting the EUROCOPTER, a dangerous instrumentality, to LIBERTY, a negligent operator.

    b.)    By failing to properly train and educate the flight crew on the fundamentals of flight in the Hudson River corridor;

c.) By failing to observe the operative and applicable governmental regulations and directives pertaining to the operation of the subject helicopter;

d.) By failing to operate the aircraft in a safe and competent manner, thereby resulting in the crash in question;

e.) By failing to use all possible means, such as TCAS, anti-collision lights, requiring onboard safety observers or any other means to make sure that the accident helicopter could see and be seen;

f.) By failing to use all available resources to insure the accident helicopter would remain clear of other aircraft;

g.) By failing to follow Federal Aviation Regulations regarding pilot responsibilities to see and avoid other aircraft; and

h.) By allowing the helicopter to collide with the aircraft, killing all aboard.

WHEREFORE, Plaintiff hereby demands judgment against LIBERTY and MERIDIAN for:

a.) Pre-Impact fear and terror and pain and suffering of the DECEDENT prior to death;

b.) Pain and suffering of the DECEDENT'S family/or beneficiaries from the date of DECEDENT'S death;

c.)    Loss of consortium, society, companionship, support and services from the date of DECEDENT'S death;

d.)    Loss of support in money or in kind from the date of the DECEDENT'S death;

e.)    Loss of prospective net estate accumulations beyond death of the DECEDENT, reduced to present value;

f.)    Grief, emotional distress and personal injuries and moral damages as allowed by law;

g.)    Loss of enjoyment of his life;

h.)    Funeral expenses due to DECEDENT'S death that may become a charge against the estate or that were paid by or on behalf of the DECEDENT;

i.)    Pre-judgment interest;

j.)    Costs and attorneys fees; and

k.)    Any other damages to which the Plaintiff, survivors and/or beneficiaries may be entitled under applicable law.

## COUNT II
## WILLFUL AND WANTON MISCONDUCT
## AGAINST LIBERTY AND MERIDIAN

79.    Plaintiff incorporates by reference paragraphs 1 through 71 above as if fully set forth herein.

80.    The crash and consequent deaths of the Plaintiff's DECEDENT was the direct and immediate result of the willful, wanton, reckless, and/or grossly negligent misconduct of Defendants MERIDIAN and LIBERTY in failing and refusing to protect those persons aboard the accident helicopter from known dangers of an extraordinary nature, posed by the unsafe aircraft operations as follows:

a.)    By negligently entrusting the EUROCOPTER, a dangerous instrumentality, to LIBERTY, a negligent operator;

b.)    By failing to properly train and educate the flight crew on the fundamentals of flight in the Hudson River corridor;

c.)    By failing to observe the operative and applicable governmental regulations and directives pertaining to the operation of the subject helicopter;

d.)    By failing to operate the aircraft in a safe and competent manner, thereby resulting in the crash in question;

e.)    By failing to use all possible means, such as TCAS, anti-collision lights, extra crewmembers or any other means to make sure that the accident helicopter could see and be seen;

f.)    By failing to use all available resources to insure the accident helicopter would remain clear of other aircraft;

g.)    By failing to follow Federal Aviation Regulations regarding pilot responsibilities to see and avoid other aircraft; and

h.)    By allowing the helicopter to collide with the aircraft, killing all aboard.

81.    The crash of the above-described flight on August 8, 2009, was caused by such known and reasonably foreseeable conditions.

82.    By reason of the above-stated acts of wanton, willful, reckless, and/or grossly-negligent conduct, evidencing willful and reckless indifference to the safety, welfare, health, security, and well-being of their passengers, including the Plaintiff's DECEDENT, in the face of known and notorious risks, LIBERTY and MERIDIAN are liable to the Plaintiff for exemplary damages.

## COUNT III
## WRONGFUL DEATH AGAINST LIBERTY AND MERIDIAN

83.    Plaintiff incorporates by reference paragraphs 1 through 71 above as if fully set forth herein.

84.    At all times material, LIBERTY and MERIDIAN owed a duty to all persons aboard the accident aircraft to operate and control the subject helicopter, on the ground and in the air, with the highest degree of care, and to exercise the highest degree of care to prevent injury of any kind, including injury and death as a result of known dangers.

85.    The air crash which occurred on August 8, 2009, and which resulted in the deaths of all on board, was a direct and proximate result of the negligence and willful misconduct hereinafter alleged of LIBERTY and MERIDIAN.

86.    LIBERTY and MERIDIAN, by and through their agents, employees, and representatives, willfully and otherwise breached the duty owed to Plaintiff's DECEDENT in some or all of, but not limited to, the following regards:

a.)    By negligently entrusting the EUROCOPTER, a dangerous instrumentality, to LIBERTY, a negligent operator;

b.)    By failing to properly train and educate the flight crew on the fundamentals of flight in the Hudson River corridor;

c.)    By failing to observe the operative and applicable governmental regulations and directives pertaining to the operation of the subject helicopter;

d.)    By failing to operate the aircraft in a safe and competent manner, thereby resulting in the crash in question;

e.)    By failing to use all possible means, such as TCAS, anti-collision lights, extra crewmembers or any other means to make sure that the accident helicopter could see and be seen;

f.)    By failing to use all available resources to insure the accident helicopter would remain clear of other aircraft;

g.) By failing to follow Federal Aviation Regulations regarding pilot responsibilities to see and avoid other aircraft; and

h.) By allowing the helicopter to collide with the aircraft, killing all aboard.

WHEREFORE, Plaintiff hereby demands judgment against LIBERTY and MERIDIAN for:

a.) Pre-Impact fear and terror and pain and suffering of the DECEDENT prior to her death;

b.) Pain and suffering of the DECEDENT'S family/or beneficiaries from the date of DECEDENT'S death;

c.) Loss of consortium, society, companionship, support and services from the date of DECEDENT'S death;

d.) Loss of support in money or in kind from the date of the DECEDENT'S death;

e.) Loss of prospective net estate accumulations beyond death of the DECEDENT, reduced to present value;

f.) Grief, emotional distress and personal injuries and moral damages as allowed by law;

g.) Loss of enjoyment of his life;

h.) Funeral expenses due to DECEDENT'S death that

may become a charge against the estate or that were paid by or on behalf of the DECEDENT;

i.)   Pre-judgment interest;

j.)   Costs and attorneys fees; and

k.)   Any other damages to which the Plaintiff, survivors and/or beneficiaries may be entitled under applicable law.

## COUNT IV
## NEGLIGENCE AGAINST THE ALTMAN ESTATE
## AND LCA PARTNERSHIP

87.   Plaintiff incorporates by reference paragraphs 1 through 71 above as if fully set forth herein.

88.   At all times material ALTMAN owed a duty to foreseeable third parties, including all persons aboard the accident helicopter, to operate and control the PIPER, on the ground and in the air, with the highest degree of care, and to exercise the highest degree of care to prevent injury of any kind, including injury and death as a result of known dangers posed by the improperly operated PIPER.

89.   At all times material, LCA PARTNERSHIP was the owner of the PIPER, a dangerous instrumentality.

90.   At all times material, LCA PARTNERSHIP permitted ALTMAN to operate the PIPER, a dangerous instrumentality.

91.   At all times material hereto, LCA PARTNERSHIP had a duty to ensure that ALTMAN operated the PIPER in a safe and prudent manner.

92.    The air crash which occurred on August 8, 2009, and which resulted in the deaths of all on board the PIPER and the EUROCOPTER, was a direct and proximate result of the negligence and willful misconduct alleged herein of ALTMAN.

93.    ALTMAN and LCA PARTNERSHIP, by and through their agents, employees, and representatives, willfully and otherwise breached the duty owed to the DECEDENT in some or all of, but not limited to, the following regards:

      a.)    Negligently entrusting the PIPER, a dangerous instrumentality, to a negligent pilot, ALTMAN;

      b.)    By failing to properly train and educate ALTMAN on the fundamentals of flight in the Hudson River corridor;

      c.)    By failing to observe the operative and applicable governmental regulations and directives pertaining to the operation of the subject PIPER;

      d.)    By failing to operate the aircraft in a safe and competent manner, thereby resulting in the crash in question;

      e.)    By failing to use all possible means, such as TCAS, anti-collision lights, monitoring and reporting on the CTAF, monitoring the ATC transmissions or any other means to make sure that the accident aircraft could see and be seen;

    f.)    By failing to use all available resources to insure the accident aircraft would remain clear of other aircraft; and

    g.)    By allowing the aircraft to collide with the helicopter, killing all aboard.

WHEREFORE, Plaintiff hereby demands judgment against the Defendants, ALTMAN and LCA PARTNERSHIP for:

    a.)    Pre-Impact fear and terror and pain and suffering of the DECEDENT prior to her death;

    b.)    Pain and suffering of the DECEDENT'S family/or beneficiaries from the date of DECEDENT'S death;

    c.)    Loss of consortium, society, companionship, support and services from the date of DECEDENT'S death;

    d.)    Loss of support in money or in kind from the date of the DECEDENT'S death;

    e.)    Loss of prospective net estate accumulations beyond death of the DECEDENT, reduced to present value;

    f.)    Grief, emotional distress and personal injuries and moral damages as allowed by law;

    g.)    Loss of enjoyment of his life;

    h.)    Funeral expenses due to DECEDENT'S death that may become a charge against the estate or that

were paid by or on behalf of the DECEDENT;

i.)   Pre-judgment interest;

j.)   Costs and attorneys fees; and

k.)   Any other damages to which the Plaintiff, survivors
      and/or beneficiaries may be entitled under
      applicable law.

## COUNT V
## WILLFUL AND WANTON MISCONDUCT
## AGAINST THE ALTMAN ESTATE AND LCA PARTNERSHIP

94.    Plaintiff incorporates by reference paragraphs 1 through 71 above as if fully set forth herein.

95.    The crash and consequent deaths of the Plaintiff's DECEDENT was the direct and immediate result of the willful, wanton, reckless, and/or grossly negligent misconduct of Defendants ALTMAN and LCA PARTNERSHIP in failing and refusing to protect those persons aboard the accident helicopter from known dangers of an extraordinary nature, posed by the unsafe aircraft operations as follows:

a.)   Negligently entrusting the PIPER, a dangerous
      instrumentality, to a negligent pilot, ALTMAN;

b.)   By failing to properly train and educate ALTMAN on the
      fundamentals of flight in the Hudson River corridor;

c.) By failing to observe the operative and applicable governmental regulations and directives pertaining to the operation of the subject PIPER;

d.) By failing to operate the aircraft in a safe and competent manner, thereby resulting in the crash in question;

e.) By failing to use all possible means, such as TCAS, anti-collision lights, monitoring and reporting on the CTAF, monitoring the ATC transmissions or any other means to make sure that the accident aircraft could see and be seen;

f.) By failing to use all available resources to insure the accident aircraft would remain clear of other aircraft; and

g.) By allowing the aircraft to collide with the helicopter, killing all aboard.

96. The crash of the above-described flight on August 8, 2009, was caused by such known and reasonably foreseeable conditions.

97. By reason of the above-stated acts of wanton, willful, reckless, and/or grossly-negligent conduct, evidencing willful and reckless indifference to the safety, welfare, health, security, and well-being of their passengers, and the passenger on the EUROCOPTER, including the Plaintiff's DECEDENT, in the face of known and notorious risks, the Defendants, ATLMAN and LCA PARTNERSHIP, are liable to the Plaintiff for exemplary damages.

## COUNT VI
## WRONGFUL DEATH AGAINST THE ALTMAN ESTATE
## AND LCA PARTNERSHIP

98.    Plaintiff incorporates by reference paragraphs 1 through 71 above as if fully set forth herein.

99.    At all times material, Defendants ALTMAN and LCA PARTNERSHIP owed a duty to all persons aboard the accident helicopter to operate and control the PIPER, on the ground and in the air, with the highest degree of care, and to exercise the highest degree of care to prevent injury of any kind, including injury and death as a result of known dangers.

100.    The air crash which occurred on August 8, 2009, and which resulted in the deaths of all on board, was a direct and proximate result of the negligence and willful misconduct hereinafter alleged of Defendants ALTMAN and LCA PARTNERSHIP.

101.    Defendants ALTMAN and LCA PARTNERSHIP, by and through their agents, employees, and representatives, willfully and otherwise breached the duty owed to Plaintiff's DECEDENT in some or all of, but not limited to, the following regards:

    a.)    Negligently entrusting the PIPER, a dangerous instrumentality, to a negligent pilot, ALTMAN;

    b.)    By failing to properly train and educate ALTMAN on the fundamentals of flight in the Hudson River corridor;

c.)  By failing to observe the operative and applicable governmental regulations and directives pertaining to the operation of the subject PIPER;

d.)  By failing to operate the aircraft in a safe and competent manner, thereby resulting in the crash in question;

e.)  By failing to use all possible means, such as TCAS, anti-collision lights, monitoring and reporting on the CTAF, monitoring the ATC transmissions or any other means to make sure that the accident aircraft could see and be seen;

f.)  By failing to use all available resources to insure the accident aircraft would remain clear of other aircraft; and

g.)  By allowing the aircraft to collide with the helicopter, killing all aboard.

WHEREFORE, Plaintiff hereby demands judgment against the Defendants ALTMAN and LCA PARTNERSHIP for:

a.)  Pre-Impact fear and terror and pain and suffering of the DECEDENT prior to her death;

b.)  Pain and suffering of the DECEDENT'S family/or beneficiaries from the date of DECEDENT'S death;

c.)  Loss of consortium, society, companionship, support and services from the date of DECEDENT'S death;

d.)    Loss of support in money or in kind from the date of the DECEDENT'S death;

e.)    Loss of prospective net estate accumulations beyond death of the DECEDENT, reduced to present value;

f.)    Grief, emotional distress and personal injuries and moral damages as allowed by law;

g.)    Loss of enjoyment of his life;

h.)    Funeral expenses due to DECEDENT'S death that may become a charge against the estate or that were paid by or on behalf of the DECEDENT;

i.)    Pre-judgment interest;

j.)    Costs and attorneys fees; and

k.)    Any other damages to which the Plaintiff, survivors and/or beneficiaries may be entitled under applicable law.

## COUNT VII
### *RES IPSA LOQUITOR* AGAINST MERIDIAN, LIBERTY, THE ALTMAN ESTATE AND LCA PARTNERSHIP

102.    Plaintiff incorporates by reference paragraphs 1 through 71 above as if fully set forth herein.

103.    The DECEDENT was a fare-paying passenger on a helicopter for hire for the purpose of a sight-seeing tour of New York City.

104.    The EUROCOPTER collided with a fixed wing PIPER and crashed, killing the DECEDENT.

105.    DECEDENT was undeniably without fault in the accident.

106.    Absent the negligence of one or all of the Defendants, such a mid-air collision would not occur.

107.    The EUROCOPTER was under the exclusive control and management of LIBERTY and MERIDIAN.

108.    The PIPER was under the exclusive control and management of ALTMAN and LCA PARTNERSHIP.

109.    Negligence of all of the Defendants can be inferred by the collision, because the accident such as this does not normally occur without negligence, and because the Defendants exercised exclusive control and management over the dangerous instrumentalities that caused the collision.

110.    The horrific crash of the aircraft and the death of the DECEDENT is a *res ipsa loquitur* demonstration of negligence.

WHEREFORE, Plaintiff hereby demands judgment against the LIBERTY, MERIDIAN, ALTMAN and LCA PARTNERSHIP for:

a.)    Pain and suffering and pre-impact terror and fright of the DECEDENT prior to his death;

b.)    Pain and suffering of DECEDENT'S family and heirs from the date of DECEDENT'S death;

c.)    Loss of consortium, society, companionship, support

and services from the date of DECEDENT'S death;

d.)   Loss of support in money or in kind from the date of the DECEDENT'S death;

e.)   Loss of prospective net estate accumulations reduced to present value;

f.)   Moral harm, grief, emotional distress and other such personal injuries;

g.)   Loss of enjoyment of life;

h.)   Funeral expenses due to DECEDENT'S death that may become a charge against the estate or that were paid by or on behalf of the DECEDENT;

i.)   Pre-judgment interest;

j.)   Costs and attorneys fees; and

k.)   Any other damages to which the Plaintiff, survivors and/or beneficiaries may be entitled under applicable law.

## JURY DEMAND

Plaintiff, GINEVRA GALLAZZI, Individually, and as Administrator ad Prosquendum of the Estate of FABIO GALLAZZI, Deceased, hereby demands a trial by jury on all counts so triable.

Respectfully submitted,

**COLLIER & BASIL P.C.**

By: s/ Robert Basil
   Robert Basil, Esq.
   1270 Broadway
   Suite 305
   New York, NY 10001
   Telephone: (917) 512-3066
   robertjbasil@collierbasil.com

**MOTLEY RICE LLC**

By: s/ Mary Schiavo
   Mary Schiavo, Esq.
   Donald L. McCune, Jr., Esq.
   28 Bridgeside Blvd.
   P.O. Box 1792 (29465)
   Mount Pleasant, SC 29464
   Telephone (843) 216-9138
   Facsimile (843) 216-9440
   mschiavo@motleyrice.com
   dmccune@motleyrice.com

DATED: December 4, 2009