COLLIER & BASIL P.C.
Robert Basil, Esq.
1270 Broadway, Suite 305
New York, NY 10001
(917) 512-3066
Attorney for Plaintiffs

MOTLEY RICE LLC
Mary Schiavo, Esq.
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
(843) 216-9138
Attorney for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
## NEWARK DIVISION

### CASE NO.: 09-CV-06142-DMC-JAD

| | |
|---|---|
| *In Re Hudson River Mid-Air Collision on August 8, 2009* | *Consolidated For Discovery Purposes Only* |

**FILED IN THE BELOW MATTER:**

| | |
|---|---|
| **GINEVRA GALLAZZI**, Individually, and as Administrator ad Prosequendum of the Estate of **FABIO GALLAZZI**, Deceased, | *Consolidated Case* |
| **SILVIA RIGAMONTI NORELLI**, Individually, and as Administrator ad Prosequendum of the Estate of **FILIPPO NORELLI**, Deceased, | *Formerly* 09-CV-06143 - DMC-CCC |
| **GINEVRA GALLAZZI**, Individually, and as Administrator ad Prosequendum of the Estate of **GIACOMO GALLAZZI**, Deceased, | *Formerly* 09-CV-06144-DMC-CCC |

| | |
|---|---|
| **SILVIA RIGAMONTI NORELLI**, Individually, and as Administrator ad Prosequendum of the Estate of **MICHELE NORELLI**, Deceased, | _Formerly_<br>_09-CV-06145-DMC-CCC_ |
| **GINEVRA GALLAZZI**, Individually, and as Administrator ad Prosequendum of the Estate of **TIZIANA PEDRONI**, Deceased, | _Formerly_<br>_09-CV-06146-DMC-CCC_ |
| Plaintiffs, | |
| vs. | |
| **LIBERTY HELICOPTERS, INC.**, a New Jersey corporation; **MERIDIAN CONSULTING I CORPORATION, INC**., a New Jersey Corporation; **PAMELA ALTMAN,** as Executor of the **ESTATE OF STEVEN M. ALTMAN,** the **ESTATE OF STEVEN M. ALTMAN,** a Pennsylvania Estate; **LCA PARTNERSHIP,** an alleged Pennsylvania Partnership, **DAVID H. ALTMAN,** Individually, and as General Partner of **LCA PARTNERSHIP, DA, AERO, INC., THE UNITED STATES OF AMERICA, ALTMAN MANAGEMENT, INC.**, a Delaware Corporation; and **ALTMAN MANAGEMENT COMPANY II, INC.,** a Delaware Corporation, | |
| Defendants. | |

## SECOND AMENDED COMPLAINT
## AND JURY DEMAND

COME NOW Plaintiffs, GINEVRA GALLAZZI, and SILVIA RIGAMONTI

NORELLI, as Administrators ad Prosequendum for their causes of action on behalf

of Decedents FABIO GALLAZZI, TIZIANA PEDRONI, GIACOMO GALLAZZI,

MICHELE NORELLI and FILIPPO NORELLI, originally five separate cases which

were consolidated by Order of this Court on January 13, 2010, and thereafter on

October 4&5, 2010 by Orders of this Court the case caption was changed to include

Civil Action Nos. 10-1334, 10-4433, and 10-4434 with 09-6142 and the matters consolidated **for purposes of discovery only.**  The three Gallazzi Decedents, FABIO GALLAZZI, TIZIANA PEDRONI, GIACOMO GALLAZZI, and two Norelli Decedents, MICHELE NORELLI and FILIPPO NORELLI, by and through undersigned counsel, and for their causes of action file this Second Amended Complaint against Defendants:

LIBERTY HELICOPTERS, INC. ("LIBERTY")
P.O. Box 1338
Linden, New Jersey 07036

MERIDIAN CONSULTING I CORPORATION, INC. ("MERIDIAN")
PO Box 1338
Linden, New Jersey 07036

PAMELA ALTMAN, as Executor of the ESTATE OF STEVEN M. ALTMAN,
Deceased, and the ESTATE OF STEVEN M. ALTMAN ("ALTMAN")
J. Thompson Thornton, Esq. & Patricia A. Leid, Esq.
Thornton, Davis & Fein, P.A.
80 S.W. 8th Street, Suite 2900
Miami, FL 33130

LCA PARTNERSHIP ("LCA")
J. Thompson Thornton, Esq. & Patricia A. Leid, Esq.
Thornton, Davis & Fein, P.A.
80 S.W. 8th Street, Suite 2900
Miami, FL 33130

D A AERO, INC.
J. Thompson Thornton, Esq. & Patricia A. Leid, Esq.
Thornton, Davis & Fein, P.A.
80 S.W. 8th Street, Suite 2900
Miami, FL 33130

THE UNITED STATES OF AMERICA
Steven J. Reigel, Esq. & Barry F. Benson, Esq.
U.S. Department of Justice, Civil Division, Torts Branch
P. O. Box 14271
Washington, DC 20044-4271

DAVID H. ALTMAN, Individually, and as General Partner of
LCA PARTNERSHIP and D A AERO, INC.  ("DAVID ALTMAN")
J. Thompson Thornton, Esq. & Patricia A. Leid, Esq.
Thornton, Davis & Fein, P.A.
80 S.W. 8th Street, Suite 2900
Miami, FL 33130

ALTMAN MANAGEMENT, INC.
The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

ALTMAN MANAGEMENT COMPANY II, INC.
Allmond, Eastburn & Benge, P.A.
1400 Market Street
Wilmington, DE 19801

and allege on information and belief:

## JURISDICTION AND VENUE

1.     This is an action for damages very substantially in excess of both $75,000 and $150,000, exclusive of interest, costs, and attorneys fees.

2.     Jurisdiction exists over this action under 28 U.S.C. § 1332 because the matter in controversy exceeds the sum of $75,000, and exceeds the sum of $150,000 and the controversy is between citizens of the United States and citizens of a foreign state. Jurisdiction also exits under 28 U.S.C. § 1333(1) as Plaintiffs' claims arise from an incident occurring in whole or in part in a navigable waterway, the incident was disruptive to traditional maritime activities, and the activities leading to the incident bare a substantial relationship to traditional maritime activities.

3. This Court has exclusive jurisdiction over these claims against the United States of America pursuant to the Federal Tort Claims Act, 28 U.S.C. §1346(b)(1) and 28 U.S.C. §2671, et seq. This is a civil action for claims against the United States for money damages for loss of property, personal injury and death caused by the negligent wrongful acts or omissions of employees of the United States Government while acting within the scope of their offices or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. The Federal Aviation Administration is an operating administration of the U.S. Department of Transportation. The U.S. Department of Transportation is a Federal agency as used in Title 28 Section 1346(b) and 2401(b).

4. Alternatively, this Court also have jurisdiction over Plaintiffs' claims against the United States of America arising under Suits in Admiralty Act, 46 U.S.C. § 30901 et. seq.

5. Venue is proper under 28 U.S.C. § 1391 because a substantial part of the events giving rise to this claim occurred in this judicial district and under 28 U.S.C. §§1402(b) because this is a tort claim against the United States under the subsection (b) of section 1346 of the Title 28 and it may be prosecuted in this judicial district because it is where many of the acts or omissions complained of occurred.

6. Plaintiffs have complied with the administrative prerequisites regarding filing suit against the defendant UNITED STATES in that on November

23, 2009, Plaintiffs served upon the defendant UNITED STATES, Notices of Claim (Standard Form 95) on behalf of Decedents FABIO GALLAZZI, GIACOMO GALLAZZI, TIZIANA PEDRONI, MICHELE NORELLI and FILIPPO NORELLI (hereinafter the "DECEDENTS"), and their estates, survivors and beneficiaries, each of which were received by an agency of Defendant UNITED STATES, namely, the FEDERAL AVIATION ADMINISTRATION (the "FAA"), on November 24, 2009, and the defendant UNITED STATES, by and through the FAA, issued its denials with respect to the Notices of Claim on February 1, 2010.   Accordingly, all conditions precedent to bringing this action have been met and this action is timely instituted within six (6) months of the denials of the Notices of Claim.

7.      This action includes claims for federal maritime wrongful death and survival.

## PARTIES

8.      At all times material hereto, Plaintiffs were and are residents of Italy.

9.      At all times material hereto, the five DECEDENTS died in the United States of America while they were lawful tourists in the United States of America.

10.      At all times material hereto, Plaintiff GINEVRA GALLAZZI was duly appointed by the State of New Jersey to serve as the Administrator ad Prosequendum of the Estates of the Decedents   FABIO GALLAZZI, TIZIANA PEDRONI and GIACOMO GALLAZZI, and Plaintiff SILVIA RIGAMONTI NORELLI was duly appointed by the State of New Jersey to serve as the

Administrator ad Prosequendum of the Estates of MICHELE NORELLI and FILIPPO NORELLI.

11.    Complaints for each of the five decedents were filed on December 4, 2009, and assigned case numbers 09-CV-06142, 09-CV-06143, 09-CV-06144, 09-CV-06145 and 09-CV-06146.  The five cases, by order of this Court dated January 13, 2010, and were consolidated under the lowest numbered case, 09-CV-06142.

12.    **On October 4&5, 2010, by Order sof the Court, the five consolidated GALLAZZI and NORELLI cases were joined with Civil Action Nos. 10-1334, 10-4433, and 10-4434 for discovery purposes only and to avoid the duplication of discovery and to avoid needless expense, and re-captioned *In Re Hudson River Mid-Air Collision on August 8, 2009.***

13.    At all times material hereto, Defendant LIBERTY HELICOPTERS, INC., (LIBERTY) was a New Jersey corporation with headquarters at Linden, New Jersey.  LIBERTY was certified as an air carrier pursuant 14 C.F.R § 135 and operated the Eurocopter AS350-BA Helicopter, registration N401LH ("EUROCOPTER"), in which the DECEDENTS were fare-paying passengers and which collided in mid-air with a fixed-wing aircraft, and thereafter killing all five passengers in the LIBERTY helicopter.

14.    At all times material hereto, Defendant MERIDIAN CONSULTING I CORPORATION, INC., (MERIDIAN) was a Delaware corporation with a registered agent located in West Trenton, New Jersey.  MERIDIAN owned the EUROCOPTER

and (as a principal) allowed LIBERTY (as an agent) to operate the EUROCOPTER for the carriage of fare-paying passengers pursuant to 14 C.F.R. § 135.

15.     At all times material hereto, PAMELA ALTMAN, As Executor of the ESTATE OF STEVEN M. ALTMAN (ALTMAN), was and is the fiduciary of THE ESTATE OF STEVEN M. ALTMAN, deceased, appointed by the Court of Common Pleas of Pennsylvania for Montgomery County on August 21, 2009, and, upon information and belief, said appointment has not been revoked.

16.     At all times material hereto, THE ESTATE OF STEVEN M. ALTMAN (ALTMAN) was and is, upon information and belief, a Pennsylvania estate that holds the assets of Steven M. Altman, deceased, who was the operator of a Piper PA-32R-300 aircraft, registration N71MC (PIPER), which collided with the LIBERTY helicopter in which the DECEDENTS were fare-paying passengers.

17.     At all times material hereto, LCA PARTNERSHIP was a name which appears on filings with the Federal Aviation Administration as the owner of the PIPER operated by ALTMAN that collided with the EUROCOPTER operated by LIBERTY.   The identities of all of the partners of LCA PARTNERSHIP are unknown to Plaintiffs, as there is no record of LCA PARTNERSHIP on file with the State of Pennsylvania.   Plaintiffs have been advised by counsel for LCA of the identity of two partners, DAVID ALTMAN and DA AERO, INC.   LCA PARTNERSHIP has not filed as any of the recognized Pennsylvania business organizations, including but not limited to: Fictitious Names, Pennsylvania Business Corporation, Pennsylvania Nonprofit Corporation, Foreign Business

8

Corporation, Pennsylvania Limited Partnership, Foreign Limited Partnership, Pennsylvania Limited Liability Company, Foreign Limited Liability Company, Pennsylvania Limited Liability Corporation, Pennsylvania Limited Liability Partnership or Foreign Limited Liability Partnership. In the absence of proper registration and filings with the State of Pennsylvania, the partners, including de facto and implied partners, are liable to Plaintiffs.

18.    At all times material hereto, upon information and belief, DAVID ALTMAN was and is a Pennsylvania resident and a partner in LCA PARTNERSHIP, the owner of the PIPER which collided with the LIBERTY helicopter in which the DECEDENTS were fare-paying passengers.

19.    At all times material hereto, upon information and belief, D A AERO, INC., is a Pennsylvania corporation and a partner in LCA PARTNERSHIP, the owner of the PIPER which collided with the LIBERTY helicopter in which the DECEDENTS were fare-paying passengers. DAVID ALTMAN is the President of DA AERO, INC.

20.    At all times material hereto, upon information and belief, ALTMAN MANAGEMENT, INC. ("ALTMAN MANAGEMENT"), was and is a Delaware corporation and the employer at the relevant times of ALTMAN, the operator of the PIPER aircraft, which collided with the LIBERTY helicopter in which the DECEDENTS were fare-paying passengers. Upon information and belief, ALTMAN was acting within the scope of his employment and/or as an agent of ALTMAN MANAGEMENT at the time of the collision. ALTMAN MANAGEMENT

may be served at The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

21.    At all times material hereto, upon information and belief, ALTMAN MANAGEMENT COMPANY II, INC. ("ALTMAN MANAGEMENT II"), was and is a Delaware corporation, and the employer at the relevant times of ALTMAN, the operator of the PIPER aircraft, which collided with the LIBERY helicopter in which the DECEDENTS were fare-paying passengers.  Upon information and belief, ALTMAN was acting within the scope of his employment and/or as an agent of ALTMAN MANAGEMENT II at the time of the collision.    ALTMAN MANAGEMENT II may be served at Allmond, Eastburn and Benge, P.A., 1400 Market Street, Wilmington, DE 19801.

22.    At all times material hereto, the Federal Aviation Administration (FAA) was an operating administration of the United States Department of Transportation which is the federal agency of the United States government charged with ensuring safe air transportation through its operation of air traffic control.

23.    Among the duties of the FAA is to supply, through its employees and/or agents, flight following and monitoring in accordance with the FAA internal procedures set out in FAA Order JO 7110.65, titled Air Traffic Control.

24.    The FAA, through its employees and agents, provided flight following and monitoring during the accident flight.

## ALLEGATIONS COMMON TO ALL COUNTS

25.   This claim is made on behalf of the five DECEDENTS, who were injured as a result of a mid-air collision between the LIBERTY EUROCOPTER and the PIPER aircraft over the Hudson River on August 8, 2009, and who were killed after the LIBERTY helicopter in which they were passengers impacted the water and subsequently plunged into the depths of the Hudson River.

26.   This claim is also made on behalf of all the lawful heirs and beneficiaries of the five DECEDENTS who were killed in the Hudson River on August 8, 2009.

27.   The DECEDENTS were fare paying passengers aboard the EUROCOPTER operated by LIBERTY, which was conducting a sightseeing tour of the New York City area along the Hudson River.

28.   The EUROCOPTER, in which the DECEDENTS were passengers, collided in mid-air with the PIPER, a fixed wing aircraft operated by ALTMAN.

29.   At 11:44 A.M., the Teterboro (TEB) Front Line Manager, who was also performing duties as Controller-in-Charge (CIC) for the scheduled CIC who was on a break, departed the air traffic control facility to conduct a personal errand and failed to advise other controllers that he was leaving.

30.   FAA Order 7110.3 and TEB's standard operating procedures mandate that the Local Control (LC) position must not be combined or consolidated with any other non local control position.

31.     During the events leading up to the mid-air collision between the PIPER and the EUROCOPTER, the TEB Local Control (LC), Ground Control (GC), and CIC positions were consolidated and performed by a single controller (hereinafter referred to as the TEB LC/GC).

32.     Meridian Air is a fixed base operator located at TEB.

33.     According to the Meridian Air ramp receipt dated August 8, 2009, prior to the PIPER's departure from TEB, ALTMAN parked the PIPER and signed it in at Meridian Air under the company name of "Altman Management".

34.     FAA Form 337, Major Repair and Alteration maintenance records list the owner of PIPER, Serial No. 32R-7680172 as "LCA Partnership," with an address in 2001 as RR 3 590 Snyder Ave., West Chester, PA, 19382; in 2003 as 10447 Drummond Rd., Philadelphia, PA, 19154-3805; and as 115 New St., Glenside, PA, 19038-4511 in 2007.

35.     Normal operating procedures at TEB dictate aircraft departing to the southwest contact New York Terminal Radar Approach Control on frequency 119.2, while aircraft departing southeast "VFR down the river" contact Newark Airport Traffic Control Tower on frequency 127.85.

36.     Prior to departure from TEB, the PIPER pilot contacted TEB Clearance Delivery (CD) and requested radar advisories to Ocean City, New Jersey at 3,500 feet.

37.     Because the CD controller assumed the PIPER would depart TEB in a southwest (SW) direction, the controller issued a departure control frequency for

aircraft departures to the southwest, which is not the departure control frequency for aircraft departures towards the Hudson River.

38.    The CD controller wrote "SW" on the PIPER's flight progress strip, but at no time did the CD controller query the PIPER pilot to determine his intended direction of flight.

39.    While on outbound taxi, the PIPER pilot informed the TEB LC/GC that he intended to depart the airfield "VFR (Visual Flight Rules) down the river."

40.    Despite clear knowledge that the PIPER pilot intended to depart VFR down the river, the TEB LC/GC failed to update the PIPER's flight progress strip, and failed to issue the PIPER pilot the proper departure frequency of 127.85 for aircraft departures to the southeast.

41.    At the time of the mid-air collision between the PIPER and the EUROCOPTER, the PIPER pilot had logged 0.7 hours of flight time during the prior thirty day period, and he had logged only 6.8 hours in the last sixty days, and he had logged only 17.7 hours in the prior ninety days.

42.    Pursuant to the toxicology report performed by the FAA's Civil Aerospace Medical Institute (CAMI) laboratory, the PIPER pilot was found to have an ethanol content in his blood of .038 mg/dL.

43.    The PIPER pilot's .038 mg/dL blood ethanol level indicates that he was operating the PIPER with alcohol in his system at the time of the mid-air collision, in violation of numerous federal regulations.

44. At TEB, the PIPER pilot demonstrated confusion and made a number of performance and communication errors while operating the PIPER, in that he read back taxi and takeoff instructions incorrectly, and appeared uncertain as to whether he had been previously cleared for takeoff.

45. Despite a relatively simple taxi route from the Meridian Air FBO to runway 19, the PIPER pilot had to ask for "progressive taxi" instructions, and he required a prompt to "turn left" after takeoff to avoid transiting through Newark's busy approach corridor.

46. Errors demonstrated by the PIPER pilot indicate poor situational awareness, lack of flight preparation, and lack of flight proficiency in operating the PIPER.

47. Based on the errors made by the PIPER pilot, the TEB LC/GC should have reasonably foreseen that the PIPER pilot's previously demonstrated incapacity to comprehend or perform earlier stated Air Traffic Control (ATC) instructions would require him to maintain a higher level of attentiveness when communicating with the PIPER pilot to ensure that the PIPER pilot received and understood ATC instructions.

48. When the PIPER pilot requested progressive taxi instructions, the TEB LC/GC failed to provide such instructions, and simply re-issued previously stated taxi instructions.

49.     When the PIPER pilot incorrectly read back the assigned taxi instructions, the TEB LC/GC did not notice, or failed to correct, the PIPER pilot's mistake.

50.     The PIPER departed TEB at approximately 11:49 A.M.

51.     At 11:50:41 A.M., the TEB LC/GC initiated an unauthorized personal telephone call to TEB operations, and during this unauthorized telephone conversation, the TEB LC/GC directed the PIPER to commence a left run to join the Hudson River.

52.     Previously, between 11:36:00 A.M. and 11:36:40 A.M., the TEB LC/GC made an unauthorized personal telephone call to TEB airport operations, and during this unauthorized telephone conversation a Learjet had to radio the TEB LC/GC three times to gain the controller's attention to obtain authorization to taxi.

53.     At 11:52:19 A.M., while conducting an unauthorized personal telephone conversation, the TEB LC/GC instructed the PIPER pilot to contact Newark tower on frequency 127.85, but the PIPER pilot's read back was garbled and partially unintelligible, and due to the ongoing distraction from the unauthorized personal telephone conversation the TEB LC/GC failed to recognize the incorrect read back, or ensure that the PIPER pilot properly received the frequency.

54.     At 11:52:19 A.M., the TEB LC/GC directed the PIPER to contact Newark tower on frequency 127.85, but there were three aircraft on Newark's area surveillance radar (ASR) that were in transit through the Hudson River Exclusion Area at the time and in potential conflict with the PIPER's flight path.

55.    Despite the three radar targets' close proximity to the PIPER, the TEB LC/GC controller failed to alert the PIPER pilot to the existence of any of these other aircraft prior to directing the PIPER pilot to contact Newark tower.

56.    The Newark CBA controller recognized the conflict between the PIPER and the other aircraft, and requested the TEB LC/CG to direct the PIPER to a heading of 220 degrees to vector it away from these three radar targets in the Hudson River Exclusion Area and prevent the PIPER from interfering with the busy final approach course to Newark's runway 22L/R.

57.    Due to the ongoing distraction from the TEB LC/GC's unauthorized personal telephone conversation, the TEB LC/GC missed the first communication request from the Newark CBA controller, and by the time the TEB LC/GC was able to receive and relay Newark's request, the PIPER pilot had already switched off frequency.

58.    The TEB tower cab receives a real-time remote display of the Newark air traffic control radar, and had the TEB LC/GC not been distracted by his unauthorized personal telephone call, the TEB LC/GC could have recognized and relayed these traffic conflicts to the PIPER pilot.

59.    Upon information and belief, relevant New York Air Traffic Control tapes reveal that the PIPER pilot failed to check in on any established New York ATC frequency.

60.    The PIPER pilot's incorrect read back of Newark's tower frequency was the last recorded radio transmission from the PIPER.

61.    According to FAA Order JO 7110.65, titled Air Traffic Control, the primary purpose of the Air Traffic Control system is to prevent a collision between aircraft operating in the system and to organize and expedite the flow of traffic.

62.    The FAA, through its employees and/or agents, is required to provide flight, monitoring, flight advisories, and safety alerts in accordance with the FAA's internal procedures as set forth in FAA Order JO 7110.65.

63.    As stated in FAA Order JO 7110.65, air traffic controllers shall provide additional service procedures to the extent permitted by higher priority duties and other circumstances.  This provision of additional services is not optional on the part of the controller, but rather is required when the work situation permits.

64.    Had the PIPER pilot received the correct departure frequency while on the ground at TEB, or had the TEB LC/GC recognized and corrected the PIPER pilot's incorrect frequency read back, the PIPER pilot could have contacted Newark's tower controller and thus been alerted to all known airborne traffic in the Hudson River Exclusion Area.

65.    Between 11:52:33 A.M. and 11:53:14 A.M., which was the time period when the TEB LC/GC and Newark tower were unable to communicate with the PIPER, there were eleven "conflict alerts" on the Newark airport surveillance radar, and both the conflict alert visual presentation and aural alerting systems were available to the TEB LC/GC in the TEB tower.

66.     A "conflict alert" is a function of surveillance radar automated systems that is designed to alert radar controllers to existing or pending situations between radar tracked targets that require immediate attention or action.

67.     During post-accident interviews, neither the TEB LC/GC nor the Newark CBA controller recalled seeing a conflict alert on the radar presentation or hearing the conflict alert alarm.

68.     Despite a medical clearance limitation which required the Newark CBA controller to wear corrective lenses while performing air traffic control duties, he admitted during the post-accident investigation that he was not wearing corrective lenses while working the CBA position.

69.     During the post accident investigation, there were no discrepancies noted with either the TEB or Newark radar conflict alert capabilities.

70.     In a Letter of Agreement dated April 1, 2007, LIBERTY and other Hudson River air tour operators agreed upon four standard helicopter tour routes (Tours Alpha through Delta) for helicopter air tours, and during the mishap flight the EUROCOPTER pilot was executing "Tour Alpha."

71.     The Letter of Agreement between LIBERTY and other Hudson River air tour operators does not delineate altitudes for the air tour routes.

72.     Upon information and belief, the EUROCOPTER was climbing to 1000 feet just prior to the mid-air collision with the PIPER.

73.     At the time of the mid-air collision, the PIPER and the EUROCOPTER were at an altitude of 1100 feet.

18

74.    Upon information and belief, at the time of the mid-air collision, LIBERTY's standard procedure directed pilots to set their helicopter altimeter's to zero altitude prior to departure.

75.    The West 30th Street Heliport is an aviation facility located along the Hudson River, a navigable commercial waterway.

76.    Pursuant to Federal Aviation Regulation 14 C.F.R. § 91.121, each person operating an aircraft shall maintain the cruising altitude or flight level of that aircraft, as the case may be, by reference to an altimeter that is set, when operating:

a)    Below 18,000 feet MSL, to the current reported altimeter setting of a station along the route and within 100 nautical miles of the aircraft;

b)    if there is no station within the area prescribed above, the current reported altimeter setting of an appropriate available station; or

c)    In the case of an aircraft not equipped with a radio, the elevation of the departure airport or an appropriate altimeter setting available before departure.

77.    The EUROCOPTER departed from the West 30th Street Heliport in New York, New York, at approximately 11:52 A.M. EDT for a 12-minute helicopter tour.

78.    The EUROCOPTER first appeared on Newark area surveillance radar at 11:52:27 A.M.

79.    After takeoff, the EUROCOPTER crossed the Hudson River from east to west in a climb to 400 feet, and upon reaching the western side of the river, the

EUROCOPTER commenced a left turn towards the south and continued a climb to 1100 feet.

80.    Shortly after 11:53 A.M., the PIPER and EUROCOPTER collided, resulting in the crash of both aircraft and the death of nine people, including the DECEDENTS.

81.    The last radar return on Newark airport surveillance radar of either the EUROCOPTER or the PIPER occurred at 11:53:14 A.M.

82.    At the time of the mid-air collision, the sky was clear and the visibility was ten statute miles.

83.    Neither the EUROCOPTER nor the PIPER filed a flight plan for their respective flights prior to the mid-air collision.

84.    At the time of the mid-air collision, both the PIPER and the EUROCOPTER were operating under Visual Flight Rules.

85.    The United States Coast Guard restricted maritime traffic in the Hudson River following the mid-air collision of the PIPER and the EUROCOPTER.

86.    On the night of August 8, 2009, the United States Coast Guard maintained a two-mile "safety zone" from the Holland Tunnel to the Lincoln Tunnel, requiring vessels to move slowly and stay within 400 yards of the Manhattan side while passing through the area, and this "safety zone" was maintained by the United States Coast Guard Cutter (USCGC) *Penobscot Bay.*

87.    The mid-air collision of the EUROCOPTER and the PIPER is a maritime accident that is thus subject to federal maritime law.

88.    LIBERTY has experienced eight helicopter mishaps related to either pilot errors or maintenance errors since 1995, and four of these mishaps have occurred within the last two years.

89.    LIBERTY has incurred fifteen FAA enforcement actions since 1988.

90.    Upon information and belief, LIBERTY is a member of the "Tour Operators Program of Safety", which is a program that holds air tour operators to a higher standard than 14 C.F.R. Part 135.

91.    Despite membership in the Tour Operators Program of Safety, LIBERTY lacked formal procedures for safety/incident reporting and monitoring, Go/NoGo flight decision making, risk assessment and risk management, aeronautical decision making, and crew resource management at the time of the mid-air collision.

92.    The EUROCOPTER involved in the mid-air collision was equipped with Traffic Information Services, which is capable of providing pilots with in the cockpit visual cueing and aural alerts to traffic conflicts, but LIBERTY did not mandate the use of Traffic Information Services by LIBERTY pilots.

93.    LIBERTY pilots perform dual duties as helicopter pilot and tour guide.

94.    LIBERTY does not operate air tours utilizing a safety observer.

95.    At all times relevant to the instant mid-air collision, the TEB tower was authorized to be staffed with five (5) air traffic controllers.

96.    At all times relevant to the instant mid-air collision, there were only two (2) air traffic controllers working in the TEB tower cab.

97.    At all times relevant to the accident, two (2) TEB assigned air traffic controllers were on break.

98.    At all times relevant to the accident, the Front Line Manager had left the TEB premises, informing no one of his whereabouts, and he was unable to be reached after the accident by cell phone.

99.    From two (2) minutes after he cleared the PIPER for takeoff, and continuing through the time of the accident, the TEB LC/GC was conducting a personal telephone conversation unrelated to his air traffic control duties and in derogation of his responsibilities to provide VFR flight following as requested by the PIPER pilot and mandated in FAA Order 7110.65.

100.    At all times relevant to this accident, the Front Line Manager was unavailable to provide monitoring and situational awareness in the TEB tower cab, including monitoring of potential traffic conflicts and monitoring and policing of the unauthorized and non-business related conversations that the TEB LC/GC engaged in during the whole of the accident sequence.

101.    The FAA knew, should have known, or in the exercise of reasonable care, would have known, that if it failed to follow its own ATC procedures for operating in the Hudson River corridor, it was reasonably foreseeable that persons in aircraft operating in the Hudson River Corridor, including the DECEDENTS, would face an unreasonable risk of personal injury or death.

22

102.    Because of the FAA's negligence, it breached its duties to the DECEDENTS and this breach was the proximate cause of death of the DECEDENTS, and caused the damages sustained thereby.

103.    The TEB Front Line Manager's behavior was negligent, grossly negligent, reckless and wanton, in that he:

a)    Intentionally abandoned his duty position when not authorized to do so;

b)    Abandoned his duty position to conduct personal business on government time;

c)    Failed to inform other FAA employees of his whereabouts during his absence to perform personal errands;

d)    Failed to monitor the traffic situation in the TEB vicinity during his absence;

e)    Failed to supervise and correct the TEB LC/GC who was on a personal call during the entirety of the accident sequence instead of devoting his time efforts and attention to the air traffic control responsibilities;

f)    Permitted air traffic controllers under his supervision to violate FAA Orders and TEB Standard Operating Procedures; and

g)    Violated numerous sections of the Air Traffic Control Procedures Manual, in effect on August 8, 2009 (the "ATC Manual"), including but not limited to, those sections and paragraphs of the ATC Manual concerning the duty to provide required traffic advisories to the pilot of the subject PIPER, as well as the duty to prevent the TEB LC/GC from conducting personal telephone calls while responsible for providing air traffic control services to aircraft.

104.    The TEB Front Line Manager's negligent, grossly negligent, reckless and wanton behavior breached his duties owed to the DECEDENTS and was a

substantial contributing factor to and a proximate cause of the death of the DECEDENTS, and the damages sustained thereby.

105.    The TEB LC/GC's behavior was negligent, grossly negligent, reckless and wanton, in that:

a)    Due to complacency, inattention or distraction, the TEB LC/GC failed to provide the VFR flight following requested by the PIPER pilot in compliance with the strictures of FAA Order 7110.65;

b)    Due to complacency, inattention or distraction, the TEB LC/GC failed to timely hand the PIPER pilot off to Newark controllers;

c)    Due to complacency, inattention or distraction, the TEB LC/GC failed to detect an improper frequency read back by the PIPER pilot during the belated hand off to Newark;

d)    Due to complacency, inattentiveness or distraction, the TEB LC/GC failed to notice a traffic conflict and/or take any action to resolve it;

e)    Due to complacency, inattentiveness or distraction, the TEB LC/GC failed to update the PIPER's departure strip, or provide the PIPER pilot with the proper frequency for a southeast departure; and

f)    During the entirety of the events leading to the accident, the TEB LC/GC engaged in a personal phone call while simultaneously, ineffectively and dangerously acting as the sole controller on watch in the TEB tower, in derogation of his duties to the flying public, and in particular, those nine (9) who perished that day, including the DECEDENTS.

106.    The TEB LC/GC's negligent, grossly negligent, reckless and wanton behavior breached his duties to the Decedents and was a substantial contributing

factor to and a proximate cause of the death of the DECEDENTS, and caused the damages sustained thereby.

107.   As a common carrier, LIBERTY was obligated to provide the highest degree of care in the maintenance and operation of its aircraft, a dangerous instrumentality.  In this respect, LIBERTY owed the highest degree of care to all persons aboard the EUROCOPTER.

108.   LIBERTY was responsible for the safe and proper maintenance of the EUROCOPTER, as well as the aircraft's safe and proper operation during its flight, ensuring that the EUROCOPTER's pilot had the proper training and rest.

109.   LIBERTY's behavior was negligent, grossly negligent, reckless and wanton, in that LIBERTY:

  a)   Due to improper and inadequate supervision, oversight, and management, failed to conduct helicopter air tour flight operations in a safe and reasonable manner;

  b)   Failed to conduct proper and adequate pilot training;

  c)   Failed to properly staff and maintain a robust safety program;

  d)   Failed to conduct formal pilot and crew resource management training;

  e)   Failed to conduct pilot aeronautical decision making training;

  f)   Failed to develop and implement a formal risk management program;

  g)   Failed to develop and implement a safety/incident reporting or monitoring system;

h)    Failed to develop and implement a formal Go/NoGo flight decision matrix;

i)    Failed to train pilots to use all reasonable and available resources on board the aircraft to reduce or eliminate an obvious and foreseeable mid-air hazard in the Hudson River Exclusion Area; and

j)    Failed to use all reasonable and available resources to reduce or eliminate an obvious and foreseeable mid-air hazard in the Hudson River Exclusion Area.

110.    LIBERTY breached its duty of care by willfully, wantonly, recklessly, and negligently failing to operate and maintain the EUROCOPTER aircraft in a safe and airworthy manner and this breach was a substantial contributing factor to and a proximate cause of the deaths of the DECEDENTS, and caused the damages sustained thereby.

111.    The LIBERTY EUROCOPTER pilot's behavior was negligent, careless, and reckless, in that the pilot:

a)    Failed to adhere to Federal Aviation Regulation 14 C.F.R. § 91.111(a) which states, "no person may operate an aircraft so close to another aircraft as to create a collision hazard";

b)    Failed to adhere to Federal Aviation Regulation 14 C.F.R. § 91.113(b), which states, "[w]hen weather conditions permit, regardless of whether an operation is conducted under instrument flight rules or visual flight rules, vigilance shall be maintained by each person operating an aircraft so as to see and avoid other aircraft";

c)    Due to complacency, inattention or distraction, failed to maintain 1000 feet altitude in accordance with standard procedures developed by LIBERTY for route Alpha; and

d)    Failed to use all reasonable and available resources on board the aircraft to reduce or eliminate an obvious and

foreseeable mid-air hazard in the Hudson River Exclusion Area.

112.   The DECEDENTS were at all times material herein, passengers on the accident flight.  The pilot of the LIBERTY EUROCOPTER breached his duties to the DECEDENTS and they were killed by the willful, wanton, reckless, and negligent misconduct of the pilot of the LIBERTY EUROCOPTER and this misconduct was a substantial contributing factor to and a proximate cause of the deaths of the DECEDENTS,  and caused the damages sustained thereby.

113.   LIBERTY is vicariously liable for the torts of its employees and/or agents, including the EUROCOPTER pilot, by virtue of *respondeat superior* and principles of agency.

114.   The PIPER pilot's behavior was negligent, careless, and reckless, in that ALTMAN, upon information and belief:

a)   Did not properly follow the procedures for entering and operating in the Hudson River class "B" airspace, in that he failed to monitor the Common Traffic Advisory Frequency (CTAF) and failed to keep a proper lookout for other aircraft;

b)   As the pilot of the PIPER, negligently, carelessly, and recklessly failed to adhere to Federal Aviation Regulation 14 C.F.R. § 91.113(b), which states, "[w]hen weather conditions permit, regardless of whether an operation is conducted under instrument flight rules or visual flight rules, vigilance shall be maintained by each person operating an aircraft so as to see and avoid other aircraft";

c)   As the pilot of the PIPER, negligently, carelessly, and recklessly failed to adhere to Federal Aviation Regulation 14 C.F.R. § 91.111(a) which states, "no person may

operate an aircraft so close to another aircraft as to create a collision hazard";

d)    As the pilot of the PIPER, negligently failed to properly prepare for his flight, including to check, know, notate, program equipment or have on board his plane materials or manuals during his flight to enable him to properly enter the correct frequency for Newark tower and all other frequencies required during his flight;

e)    As the pilot of the PIPER, negligently failed to educate himself about and to follow the operating procedures for air traffic control in the New York City area Class "B" airspace; and

f)    ALTMAN breached his duties to the DECEDENTS by violating various aviation regulations referenced hereinabove, namely, Federal Aviation Regulation Part 91.17.

115.    ALTMAN breached his duties to the DECEDENTS and they were killed by the willful, wanton, reckless and negligent misconduct of ALTMAN, and this misconduct was a substantial contributing factor to and a proximate cause of the deaths of the DECEDENTS, and caused the damages sustained thereby.

116.    LCA and its partners, one of which was DAVID ALTMAN, who is sued herein individually and as DA AERO, INC., were the owners of the PIPER, a dangerous instrumentality, and they permitted ALTMAN, a negligent, reckless and careless operator, to fly the PIPER.

117.    LCA, DAVID ALTMAN and DA AERO, INC., failed to ensure that ALTMAN operated the PIPER in a safe and prudent manner.

118.    LCA, DAVID ALTMAN and DA AERO, INC., owed a duty to foreseeable third parties including the DECEDENTS, and as a result of their breach

of that duty, the DECEDENTS were killed by the willful, wanton, reckless and negligent misconduct of LCA, DAVID ALTMAN and DA AERO, INC., and their misconduct was a substantial contributing factor to and a proximate cause of the deaths of the DECEDENTS, and caused the damages sustained thereby.

119. ALTMAN MANAGEMENT and ALTMAN MANAGEMENT II, as employers and/or principals of ALTMAN at the relevant times, failed to ensure that ALTMAN operated the PIPER in a safe and prudent manner.

120. ALTMAN MANAGEMENT and ALTMAN MANAGEMENT II permitted ALTMAN, a negligent, reckless, and careless operator, to fly the PIPER.

121. ALTMAN MANAGEMENT and ALTMAN MANAGEMENT II owed a duty of care to foreseeable third parties including the DECEDENTS.

122. ALTMAN MANAGEMENT and ALTMAN MANAGEMENT II breached their duty of care to the DECEDENTS, and they were killed by the willful, wanton, reckless and negligent misconduct of these Defendants, and their misconduct was a substantial contributing factor to and a proximate cause of the deaths of the DECEDENTS, causing the damages sustained thereby.

123. ALTMAN MANAGEMENT and ALTMAN MANAGEMENT II are vicariously liable for the torts of their employees and/or agents, including upon information and belief ALTMAN, by virtue of *respondeat superior* and principles of agency.

124.    The DECEDENTS are without any fault, factual or legal, for any of the negligent acts and omissions, or any of the willful, wanton, reckless and negligent misconduct of the Defendants as set forth herein.

125.    As a result of the aforementioned negligence and other breaches of duty of the Defendants, and each of them, the PIPER aircraft collided with the EUROCOPTER, resulting in both aircraft plunging into the Hudson River.

126.    As a result of the aforementioned negligence and other breaches of duty of the Defendants, and each of them, the DECEDENTS were killed.

127.    The deaths of the DECEDENTS and their damages were the foreseeable result of the Defendants' negligence and other breaches of duty.

128.    The Defendants' actions and inactions were  factual, legal and proximate causes of the DECEDENTS' deaths and the damages claimed herein.

## COUNT I
## NEGLIGENCE AGAINST LIBERTY AND MERIDIAN

129.    Plaintiffs incorporate by reference all other allegations in this Second Amended Complaint as though fully set forth herein.

130.    At all times material, MERIDIAN was the owner of the helicopter, a dangerous instrumentality.

131.    At all times material, MERIDIAN permitted LIBERTY to operate the helicopter, a dangerous instrumentality.

132.    At all times material hereto, MERIDIAN had a duty to ensure that LIBERTY operated the helicopter in a safe and prudent manner.

133.   At all times material Defendant LIBERTY owed a duty to all persons aboard the accident helicopter to operate and control the accident helicopter, on the ground and in the air, with the highest degree of care, and to exercise the highest degree of care to prevent injury of any kind, including injury and death as a result of known dangers posed by an improperly operated helicopter.

134.   The air crash which occurred on August 8, 2009, and which resulted in the deaths of all on board, was a foreseeable, direct and proximate result of the negligence and willful misconduct alleged herein of Defendants MERIDIAN and LIBERTY.

135.   Defendants MERIDIAN and LIBERTY by and through their agents, employees, and representatives, willfully and otherwise breached the duties owed to DECEDENTS in some or all of, but not limited to, the following regards:

    a)    By negligently entrusting the EUROCOPTER, a dangerous instrumentality, to LIBERTY, a negligent operator;

    b)    By failing to provide proper and adequate supervision, oversight, and management, MERIDIAN and LIBERTY conducted helicopter air tour flight operations in an unsafe and unreasonable manner;

    c)    By failing to properly staff and maintain a robust safety program;

    d)    By failing to conduct formal pilot crew resource management training;

    e)    By failing to conduct formal pilot aeronautical decision making training;

    f)    By failing to develop and implement a formal risk management program;

g) By failing to develop and implement a formal safety/incident reporting or monitoring system;

h) By failing to develop and implement a formal Go/NoGo flight decision matrix;

i) By failing to train pilots to use all reasonable and available resources on board the aircraft to reduce or eliminate an obvious and foreseeable mid-air hazard in the Hudson River Exclusion Area;

j) By failing to properly train and educate the flight crew on the fundamentals of flight in the Hudson River corridor;

k) By failing to observe the operative and applicable governmental regulations and directives pertaining to the operation of the subject helicopter;

l) By failing to operate the aircraft in a safe and competent manner, thereby resulting in the crash in question;

m) By failing to use all possible means, such as TCAS, anti-collision lights, requiring onboard safety observers or any other means to make sure that the accident helicopter could see and be seen;

n) By failing to use all available resources to insure the accident helicopter would remain clear of other aircraft;

o) By failing to follow Federal Aviation Regulations regarding pilot responsibilities to see and avoid other aircraft; and

p) By allowing the helicopter to collide with the aircraft, killing all aboard.

WHEREFORE, as a foreseeable, direct and proximate result of the acts and/or omissions, of the Defendants, jointly and severally, Plaintiffs hereby demand judgment against LIBERTY and MERIDIAN for:

a) all economic and non-economic damages allowed by law;

b)      a measurable and significant period before and after the first and subsequent impacts as well as before the deaths of the DECEDENTS during which the DECEDENTS sustained significant personal injuries, including conscious and physical pain and suffering, pre and post impact fright and terror, fear of impending death, mental anguish, emotional distress, and other severe injuries, suffering, distress and harm for a measurable period of time prior to their deaths;

c)      mental and physical pain and suffering of the families and beneficiaries of the DECEDENTS;

d)      loss of consortium, society and love;

e)      loss of companionship, guidance, care, comfort and advice;

f)      loss of being allowed to live their lives and the enjoyment of their lives of the DECEDENTS;

g)      loss of enjoyment of life of the their surviving families and beneficiaries;

h)      loss of the value of living one's life and the value of life's pleasures;

i)      loss of the value of not having to live one's life alone;

j)      loss of the value of entire family and the loss of a spouse and minor child;

k)      loss of income;

l)      loss of support in money or kind;

m)      loss of services in money or in kind;

n)      loss of gross earning power and earning capacity;

o)      loss of past earnings;

p)      loss of future and prospective earnings;

q)    loss of inheritance;

r)    full pecuniary loss of the DECEDENTS;

s)    loss of prospective estate accumulations;

t)    grief, emotional distress, sorrow of the families and beneficiaries;

u)    funeral expenses, memorials and other expenses due to the deaths of the DECEDENTS;

v)    prejudgment interest;

w)    costs and attorneys fees; and

x)    any all other damages to which the DECEDENTS, and their representatives, estates, survivors and beneficiaries are lawfully entitled.

## COUNT II
## WILLFUL AND WANTON MISCONDUCT
## AGAINST LIBERTY AND MERIDIAN

136.    Plaintiffs incorporate by reference all other allegations in this Second Amended Complaint as though fully set forth herein.

137.    The crash and consequent deaths of the DECEDENTS was a foreseeable, direct and proximate result of the willful, wanton, reckless, and/or grossly negligent misconduct of Defendants MERIDIAN and LIBERTY in failing and refusing to protect those persons aboard the accident helicopter from known dangers of an extraordinary nature, posed by the unsafe aircraft operations as follows:

a)    By negligently entrusting the EUROCOPTER, a dangerous instrumentality, to LIBERTY, a negligent operator;

34

b)    By failing to provide proper and adequate supervision, oversight, and management, MERIDIAN and LIBERTY conducted helicopter air tour flight operations in an unsafe and unreasonable manner;

c)    By failing to properly staff and maintain a robust safety program;

d)    By failing to conduct formal pilot crew resource management training;

e)    By failing to conduct formal pilot aeronautical decision making training;

f)    By failing to develop and implement a formal risk management program;

g)    By failing to develop and implement a formal safety/incident reporting or monitoring system;

h)    By failing to develop and implement a formal Go/NoGo flight decision matrix;

i)    By failing to train pilots to use all reasonable and available resources on board the aircraft to reduce or eliminate an obvious and foreseeable mid-air hazard in the Hudson River Exclusion Area;

j)    By failing to properly train and educate the flight crew on the fundamentals of flight in the Hudson River corridor;

k)    By failing to observe the operative and applicable governmental regulations and directives pertaining to the operation of the subject helicopter;

l)    By failing to operate the aircraft in a safe and competent manner, thereby resulting in the crash in question;

m)    By failing to use all possible means, such as TCAS, anti-collision lights, extra crewmembers or any other means to make sure that the accident helicopter could see and be seen;

n)    By failing to use all available resources to insure the accident helicopter would remain clear of other aircraft;

o)    By failing to follow Federal Aviation Regulations regarding pilot responsibilities to see and avoid other aircraft; and

p)    By allowing the helicopter to collide with the aircraft, killing all aboard.

138.   The crash of the above-described flight on August 8, 2009, was caused by such known and reasonably foreseeable conditions.

139.   By reason of the above-stated acts of wanton, willful, reckless, and/or grossly-negligent conduct, evidencing willful and reckless indifference to the safety, welfare, health, security, and well-being of their passengers, including the DECEDENTS, in the face of known and notorious risks, LIBERTY and MERIDIAN are each liable to the Plaintiffs for exemplary damages.

<u>COUNT III</u>
<u>WRONGFUL DEATH AGAINST LIBERTY AND MERIDIAN</u>

140.   Plaintiffs incorporate by reference all other allegations in this Second Amended Complaint as though fully set forth herein.

141.   At all times material, LIBERTY and MERIDIAN owed a duty to all persons aboard the accident aircraft to operate and control the subject helicopter, on the ground and in the air, with the highest degree of care, and to exercise the highest degree of care to prevent injury of any kind, including injury and death as a result of known dangers.

142.   The air crash which occurred on August 8, 2009, and which resulted in the deaths of all on board, was a foreseeable, direct and proximate result of the negligence and willful misconduct hereinafter alleged of LIBERTY and MERIDIAN.

143.   LIBERTY and MERIDIAN, by and through their agents, employees, and representatives, willfully and otherwise breached the duties owed to Plaintiffs' DECEDENTS in some or all of, but not limited to, the following regards:

a)   By negligently entrusting the EUROCOPTER, a dangerous instrumentality, to LIBERTY, a negligent operator;

b)   By failing to provide proper and adequate supervision, oversight, and management, MERIDIAN and LIBERTY conducted helicopter air tour flight operations in an unsafe and unreasonable manner;

c)   By failing to properly staff and maintain a robust safety program;

d)   By failing to conduct formal pilot crew resource management training;

e)   By failing to conduct formal pilot aeronautical decision making training;

f)   By failing to develop and implement a formal risk management program;

g)   By failing to develop and implement a formal safety/incident reporting or monitoring system;

h)   By failing to develop and implement a formal Go/NoGo flight decision matrix;

i)   By failing to train pilots to use all reasonable and available resources on board the aircraft to reduce or eliminate an obvious and foreseeable mid-air hazard in the Hudson River Exclusion Area;

j)   By failing to properly train and educate the flight crew on the fundamentals of flight in the Hudson River corridor;

k)   By failing to observe the operative and applicable governmental regulations and directives pertaining to the operation of the subject helicopter;

l)    By failing to operate the aircraft in a safe and competent manner, thereby resulting in the crash in question;

m)   By failing to use all possible means, such as TCAS, anti-collision lights, extra crewmembers or any other means to make sure that the accident helicopter could see and be seen;

n)    By failing to use all available resources to insure the accident helicopter would remain clear of other aircraft;

o)    By failing to follow Federal Aviation Regulations regarding pilot responsibilities to see and avoid other aircraft; and

p)    By allowing the helicopter to collide with the aircraft, killing all aboard.

WHEREFORE, as a direct and proximate result of the acts and/or omissions, of the Defendants, jointly and severally, Plaintiffs hereby demand judgment against LIBERTY and MERIDIAN for:

a)    All economic and non economic damages allowed by law;

b)    a measurable and significant period before and after the first and subsequent impacts as well as before the deaths of the DECEDENTS during which the DECEDENTS sustained significant personal injuries, including conscious and physical pain and suffering, pre and post impact fright and terror, fear of impending death, mental anguish, emotional distress, and other severe injuries, suffering, distress and harm for a measurable period of time prior to their deaths;

c)    mental and physical pain and suffering of the families and beneficiaries of the DECEDENTS;

d)    loss of consortium, society and love;

e)    loss of companionship, guidance, care, comfort and advice;

f)    loss of being allowed to live their lives and the enjoyment of their lives of the DECEDENTS;

g)    loss of enjoyment of life of the their surviving families and beneficiaries;

h)    loss of the value of living one's life and the value of life's pleasures;

i)    loss of the value of not having to live one's life alone;

j)    loss of the value of entire family and the loss of a spouse and minor child;

k)    loss of income;

l)    loss of support in money or kind;

m)    loss of services in money or in kind;

n)    loss of gross earning power and earning capacity;

o)    loss of past earnings;

p)    loss of future and prospective earnings;

q)    loss of inheritance;

r)    full pecuniary loss of the DECEDENTS;

s)    loss of prospective estate accumulations;

t)    grief, emotional distress, sorrow of the families and beneficiaries;

u)    funeral expenses, memorials and other expenses due to the deaths of the DECEDENTS;

v)    prejudgment interest;

w)    costs and attorneys fees; and

x)     any all other damages to which the DECEDENTS, and their representatives, estates, survivors and beneficiaries are lawfully entitled.

**COUNT IV**
**FEDERAL MARITIME COMMON LAW --- SURVIVAL**
**AGAINST LIBERTY AND MERIDIAN**

144.    Plaintiffs incorporate by reference all other allegations in this Second Amended Complaint as though fully set forth herein.

145.    The crash of the EUROCOPTER as aforesaid in the navigable waters of the Hudson River was a maritime casualty under the general maritime law of the United States.

146.    At all times material hereto, the subject crash affected the maritime time activity of the Hudson River waterway in that the EUROCOPTER took off from a helipad abutting the Hudson River.  Further the accident closed the Hudson River for a period of time after the crash affecting trade and commerce in the navigable waters of the Hudson River and elsewhere.

147.    At all times material hereto, MERIDIAN had a duty to ensure that LIBERTY operated the helicopter in a safe and prudent manner.

148.    At all times material Defendant LIBERTY owed a duty to all persons aboard the accident helicopter to operate and control the accident helicopter, on the ground and in the air, with the highest degree of care, and to exercise the highest degree of care to prevent injury of any kind, including injury and death as a result of known dangers posed by an improperly operated helicopter.

149.    The air crash which occurred on August 8, 2009 resulted in the significant pre-death fear, apprehension, physical, and psychological injuries to all on board the EUROCOPTER.

150.    The air crash which occurred on August 8, 2009 resulted in the deaths of all on board the EUROCOPTER, and each of Plaintiffs' decedents was a non-seafarer.

151.    The air crash which occurred on August 8, 2009, and which resulted in the deaths of all on board, was a foreseeable, direct and proximate result of the negligence and willful misconduct alleged herein of Defendants MERIDIAN and LIBERTY.

152.    The air crash which occurred on August 8, 2009 resulted in the deaths of all on board the EUROCOPTER, and each of these pre-death injuries and deaths occurred within three nautical miles of shore.

153.    Defendants MERIDIAN and LIBERTY by and through their agents, employees, and representatives, willfully and otherwise breached the duties owed to DECEDENTS in some or all of, but not limited to, the following regards:

    a)    By negligently entrusting the EUROCOPTER, a dangerous instrumentality, to LIBERTY, a negligent operator.

    b)    By failing to provide proper and adequate supervision, oversight, and management, MERIDIAN and LIBERTY conducted helicopter air tour flight operations in an unsafe and unreasonable manner'

    c)    By failing to properly staff and maintain a robust safety program;

d)      By failing to conduct formal pilot crew resource management training;

e)      By failing to conduct formal pilot aeronautical decision making training;

f)      By failing to develop and implement a formal risk management program;

g)      By failing to develop and implement a formal safety/incident reporting or monitoring system;

h)      By failing to develop and implement a formal Go/NoGo flight decision matrix;

i)      By failing to train pilots to use all reasonable and available resources on board the aircraft to reduce or eliminate an obvious and foreseeable mid-air hazard in the Hudson River Exclusion Area;

j)      By failing to properly train and educate the flight crew on the fundamentals of flight in the Hudson River corridor;

k)      By failing to observe the operative and applicable governmental regulations and directives pertaining to the operation of the subject helicopter;

l)      By failing to operate the aircraft in a safe and competent manner, thereby resulting in the crash in question;

m)      By failing to use all possible means, such as TCAS, anti-collision lights, requiring onboard safety observers or any other means to make sure that the accident helicopter could see and be seen;

n)      By failing to use all available resources to insure the accident helicopter would remain clear of other aircraft;

o)      By failing to follow Federal Aviation Regulations regarding pilot responsibilities to see and avoid other aircraft; and

p)      By allowing the helicopter to collide with the aircraft, killing all aboard.

42

WHEREFORE, as a foreseeable, direct and proximate result of the acts and/or omissions, of the Defendants, jointly and severally, Plaintiffs hereby demand judgment against LIBERTY and MERIDIAN for:

a)    All economic and non-economic damages allowed by law;

b)    a measurable and significant period before and after the first and subsequent impacts as well as before the deaths of the DECEDENTS during which the DECEDENTS sustained significant personal injuries, including conscious and physical pain and suffering, pre and post impact fright and terror, fear of impending death, mental anguish, emotional distress, and other severe injuries, suffering, distress and harm for a measurable period of time prior to their deaths;

c)    mental and physical pain and suffering of the families and beneficiaries of the DECEDENTS;

d)    loss of consortium, society and love;

e)    loss of companionship, guidance, care, comfort and advice;

f)    loss of being allowed to live their lives and the enjoyment of their lives of the DECEDENTS;

g)    loss of enjoyment of life of the their surviving families and beneficiaries;

h)    loss of the value of living one's life and the value of life's pleasures;

i)    loss of the value of not having to live one's life alone;

j)    loss of the value of entire family and the loss of a spouse and minor child;

k)    loss of income;

l)    loss of support in money or kind;

m)  loss of services in money or in kind;

n)  loss of gross earning power and earning capacity;

o)  loss of past earnings;

p)  loss of future and prospective earnings;

q)  loss of inheritance;

r)  full pecuniary loss of the DECEDENTS;

s)  loss of prospective estate accumulations;

t)  grief, emotional distress, sorrow of the families and beneficiaries;

u)  funeral expenses, memorials and other expenses due to the deaths of the DECEDENTS;

v)  prejudgment interest;

w)  costs and attorneys fees; and

x)  any all other damages to which the DECEDENTS, and their representatives, estates, survivors and beneficiaries are lawfully entitled under a claim premised on a theory of general federal maritime survival jurisprudence as the beneficiaries of non-seafarers suffering fatal injuries and death within three nautical miles of shore.

## COUNT V
## FEDERAL MARITIME COMMON LAW
## WILLFUL AND WANTON MISCONDUCT AGAINST
## LIBERTY AND MERIDIAN

154.  Plaintiffs incorporate by reference all other allegations in this Second Amended Complaint as though fully set forth herein.

44

155.   The air crash which occurred on August 8, 2009 resulted in the deaths of all on board the EUROCOPTER, and each of Plaintiffs' decedents was a non-seafarer.

156.   The air crash which occurred on August 8, 2009 resulted in the deaths of all on board the EUROCOPTER, and each of these pre-death injuries deaths occurred within three nautical miles of shore.

157.   The crash and consequent deaths of the DECEDENTS was a foreseeable, direct and proximate result of the willful, wanton, reckless, and/or grossly negligent misconduct of Defendants MERIDIAN and LIBERTY in failing and refusing to protect those persons aboard the accident helicopter from known dangers of an extraordinary nature, posed by the unsafe aircraft operations as follows:

a)   By negligently entrusting the EUROCOPTER, a dangerous instrumentality, to LIBERTY, a negligent operator;

b)   By failing to provide proper and adequate supervision, oversight, and management, MERIDIAN and LIBERTY conducted helicopter air tour flight operations in an unsafe and unreasonable manner;

c)   By failing to properly staff and maintain a robust safety program;

d)   By failing to conduct formal pilot crew resource management training;

e)   By failing to conduct formal pilot aeronautical decision making training;

f)   By failing to develop and implement a formal risk management program;

g)   By failing to develop and implement a formal safety/incident reporting or monitoring system;

h)   By failing to develop and implement a formal Go/NoGo flight decision matrix;

i)   By failing to train pilots to use all reasonable and available resources on board the aircraft to reduce or eliminate an obvious and foreseeable mid-air hazard in the Hudson River Exclusion Area;

j)   By failing to properly train and educate the flight crew on the fundamentals of flight in the Hudson River corridor;

k)   By failing to observe the operative and applicable governmental regulations and directives pertaining to the operation of the subject helicopter;

l)   By failing to operate the aircraft in a safe and competent manner, thereby resulting in the crash in question;

m)   By failing to use all possible means, such as TCAS, anti-collision lights, extra crewmembers or any other means to make sure that the accident helicopter could see and be seen;

n)   By failing to use all available resources to insure the accident helicopter would remain clear of other aircraft;

o)   By failing to follow Federal Aviation Regulations regarding pilot responsibilities to see and avoid other aircraft; and

p)   By allowing the helicopter to collide with the aircraft, killing all aboard.

158.   The crash of the above-described flight on August 8, 2009, was caused by such known and reasonably foreseeable conditions.

159.   By reason of the above-stated acts of wanton, willful, reckless, and/or grossly-negligent conduct, evidencing willful and reckless indifference to the safety,

46

welfare, health, security, and well-being of their passengers, including the DECEDENTS, in the face of known and notorious risks, LIBERTY and MERIDIAN are each liable to the Plaintiffs for exemplary damages.

**COUNT VI**
**FEDERAL MARITIME COMMON LAW  ---  WRONGFUL DEATH**
**AGAINST LIBERTY AND MERIDIAN**

160.    Plaintiffs incorporate by reference all other allegations in this Second Amended Complaint as though fully set forth herein.

161.    The crash of the EUROCOPTER as aforesaid in the navigable waters of the Hudson River was a maritime casualty under the general maritime law of the United States.

162.    At all times material hereto, the subject crash affected the maritime time activity of the Hudson River waterway in that the EUROCOPTER took off from a helipad abutting the Hudson River. Further the accident closed the Hudson River for a period of time after the crash affecting trade and commerce in the navigable waters of the Hudson River and elsewhere.

163.    At all times material hereto, MERIDIAN had a duty to ensure that LIBERTY operated the helicopter in a safe and prudent manner.

164.    At all times material Defendant LIBERTY owed a duty to all persons aboard the accident helicopter to operate and control the accident helicopter, on the ground and in the air, with the highest degree of care, and to exercise the highest degree of care to prevent injury of any kind, including injury and death as a result of known dangers posed by an improperly operated helicopter.

165.   The air crash which occurred on August 8, 2009 resulted in the deaths of all on board the EUROCOPTER, and each of Plaintiffs' decedents was a non-seafarer.

166.   The air crash which occurred on August 8, 2009, and which resulted in the deaths of all on board, was a foreseeable, direct and proximate result of the negligence and willful misconduct alleged herein of Defendants MERIDIAN and LIBERTY.

167.   The air crash which occurred on August 8, 2009 resulted in the deaths of all on board the EUROCOPTER, and each of these deaths occurred within three nautical miles of shore.

168.   Defendants MERIDIAN and LIBERTY by and through their agents, employees, and representatives, willfully and otherwise breached the duties owed to DECEDENTS in some or all of, but not limited to, the following regards:

    a)   By negligently entrusting the EUROCOPTER, a dangerous instrumentality, to LIBERTY, a negligent operator;

    b)   By failing to provide proper and adequate supervision, oversight, and management, MERIDIAN and LIBERTY conducted helicopter air tour flight operations in an unsafe and unreasonable manner;

    c)   By failing to properly staff and maintain a robust safety program;

    d)   By failing to conduct formal pilot crew resource management training;

    e)   By failing to conduct formal pilot aeronautical decision making training;

48

f)     By failing to develop and implement a formal risk management program;

g)     By failing to develop and implement a formal safety/incident reporting or monitoring system;

h)     By failing to develop and implement a formal Go/NoGo flight decision matrix;

i)     By failing to train pilots to use all reasonable and available resources on board the aircraft to reduce or eliminate an obvious and foreseeable mid-air hazard in the Hudson River Exclusion Area;

j)     By failing to properly train and educate the flight crew on the fundamentals of flight in the Hudson River corridor;

k)     By failing to observe the operative and applicable governmental regulations and directives pertaining to the operation of the subject helicopter;

l)     By failing to operate the aircraft in a safe and competent manner, thereby resulting in the crash in question;

m)     By failing to use all possible means, such as TCAS, anti-collision lights, requiring onboard safety observers or any other means to make sure that the accident helicopter could see and be seen;

n)     By failing to use all available resources to insure the accident helicopter would remain clear of other aircraft;

o)     By failing to follow Federal Aviation Regulations regarding pilot responsibilities to see and avoid other aircraft; and

p)     By allowing the helicopter to collide with the aircraft, killing all aboard.

WHEREFORE, as a foreseeable, direct and proximate result of the acts and/or omissions, of the Defendants, jointly and severally, Plaintiffs hereby demand judgment against LIBERTY and MERIDIAN for:

49

a)     All economic and non-economic damages allowed by law;

b)     a measurable and significant period before and after the first and subsequent impacts as well as before the deaths of the DECEDENTS during which the DECEDENTS sustained significant personal injuries, including conscious and physical pain and suffering, pre and post impact fright and terror, fear of impending death, mental anguish, emotional distress, and other severe injuries, suffering, distress and harm for a measurable period of time prior to their deaths;

c)     mental and physical pain and suffering of the families and beneficiaries of the DECEDENTS;

d)     loss of consortium, society and love;

e)     loss of companionship, guidance, care, comfort and advice;

f)     loss of being allowed to live their lives and the enjoyment of their lives of the DECEDENTS;

g)     loss of enjoyment of life of the their surviving families and beneficiaries;

h)     loss of the value of living one's life and the value of life's pleasures;

i)     loss of the value of not having to live one's life alone;

j)     loss of the value of entire family and the loss of a spouse and minor child;

k)     loss of income;

l)     loss of support in money or kind;

m)     loss of services in money or in kind;

n)     loss of gross earning power and earning capacity;

o)     loss of past earnings;

p)     loss of future and prospective earnings;

50

q)     loss of inheritance;

r)     full pecuniary loss of the DECEDENTS;

s)     loss of prospective estate accumulations;

t)     grief, emotional distress, sorrow of the families and beneficiaries;

u)     funeral expenses, memorials and other expenses due to the deaths of the DECEDENTS;

v)     prejudgment interest;

w)    costs and attorneys fees; and

x)     any all other damages to which the DECEDENTS, and their representatives, estates, survivors and beneficiaries are lawfully entitled under a claim premised on a theory of general federal maritime wrongful death jurisprudence as the beneficiaries of non-seafarers suffering fatal injuries and death within three nautical miles of shore.

## COUNT VII
## NEGLIGENCE AGAINST ALTMAN, LCA PARTNERSHIP, DA AERO, INC., DAVID H. ALTMAN, ALTMAN MANAGEMENT AND ALTMAN MANAGEMENT II

169.   Plaintiffs incorporate by reference all other allegations in this Second Amended Complaint as though fully set forth herein.

170.   At all times material ALTMAN owed a duty to foreseeable third parties, including all persons aboard the accident helicopter, to operate and control the PIPER, on the ground and in the air, with the highest degree of care, and to exercise the highest degree of care to prevent injury of any kind, including injury and death as a result of known dangers posed by the improperly operated PIPER.

51

171.   At all times material, LCA PARTNERSHIP and/or DA AERO, INC., were the owners of the PIPER, a dangerous instrumentality.

172.   At all times material, upon information and belief, ALTMAN was operating the PIPER within the scope of his employment with ALTMAN MANAGEMENT and ALTMAN MANAGEMENT II, and/or as an agent thereof.

173.   At all times material, LCA PARTNERSHIP and/or DA AERO, INC., ALTMAN MANAGEMENT and ALTMAN MANAGEMENT II permitted ALTMAN to operate the PIPER, a dangerous instrumentality.

174.   At all times material hereto, LCA PARTNERSHIP and/or DA AERO, INC., ALTMAN MANAGEMENT, ALTMAN MANAGEMENT II had a duty to ensure that ALTMAN operated the PIPER in a safe and prudent manner.

175.   The air crash which occurred on August 8, 2009, and which resulted in the deaths of all on board the PIPER and the EUROCOPTER, was a foreseeable, direct and proximate result of the negligence and willful misconduct alleged herein of ALTMAN.

176.   ALTMAN breached his duties to the DECEDENTS, by violating various aviation regulations referenced hereinabove, namely, Federal Aviation Regulation Part 91.17.

177.   ALTMAN and LCA PARTNERSHIP, DA AERO, INC., ALTMAN MANAGEMENT and  ALTMAN MANAGEMENT II by and through their agents, employees, and representatives, willfully and otherwise breached their duties owed to the DECEDENTS in some or all of, but not limited to, the following regards:

a)   Negligently entrusting the PIPER, a dangerous instrumentality, to a negligent pilot, ALTMAN;

b)   By failing to properly train and educate ALTMAN on the fundamentals of flight in the Hudson River corridor;

c)   By failing to observe the operative and applicable governmental regulations and directives pertaining to the operation of the subject PIPER;

d)   By failing to operate the aircraft in a safe and competent manner, thereby resulting in the crash in question;

e)   By failing to use all possible means, such as TCAS, anti-collision lights, monitoring and reporting on the CTAF, monitoring the ATC transmissions or any other means to make sure that the accident aircraft could see and be seen;

f)   By violating various aviation regulations referenced hereinabove, namely, Federal Aviation Regulation Part 91.17

g)   By failing to use all available resources to insure the accident aircraft would remain clear of other aircraft; and

h)   By allowing the aircraft to collide with the helicopter, killing all aboard.

WHEREFORE, Plaintiffs hereby demand judgment against the Defendants, jointly and severally, ALTMAN, LCA PARTNERSHIP and/or DA AERO, INC., ALTMAN MANAGEMENT and ALTMAN MANAGEMENT II, for:

a)   all economic and non economic damages allowed by law;

b)   a measurable and significant period before and after the first and subsequent impacts as well as before the deaths of the DECEDENTS during which the DECEDENTS sustained significant personal injuries, including conscious and physical pain and suffering, pre and post impact fright and terror, fear of impending death, mental anguish, emotional distress, and other severe injuries,

suffering, distress and harm for a measurable period of time prior to their deaths;

c)      mental and physical pain and suffering of the families and beneficiaries of the DECEDENTS;

d)      loss of consortium, society and love;

e)      loss of companionship, guidance, care, comfort and advice;

f)      loss of being allowed to live their lives and the enjoyment of their lives of the DECEDENTS;

g)      loss of enjoyment of life of the their surviving families and beneficiaries;

h)      loss of the value of living one's life and the value of life's pleasures;

i)      loss of the value of not having to live one's life alone;

j)      loss of the value of entire family and the loss of a spouse and minor child;

k)      loss of income;

l)      loss of support in money or kind;

m)      loss of services in money or in kind;

n)      loss of gross earning power and earning capacity;

o)      loss of past earnings;

p)      loss of future and prospective earnings;

q)      loss of inheritance;

r)      full pecuniary loss of the DECEDENTS;

s)      loss of prospective estate accumulations;

t)      grief, emotional distress, sorrow of the families and beneficiaries;

u)      funeral expenses, memorials and other expenses due to the deaths of the DECEDENTS;

v)      prejudgment interest;

w)      costs and attorneys fees; and

x)      any all other damages to which the DECEDENTS, and their representatives, estates, survivors and beneficiaries are lawfully entitled.

**COUNT VIII**
**WILLFUL AND WANTON MISCONDUCT AGAINST**
**ALTMAN, LCA PARTNERSHIP, DA AERO, INC.,**
**ALTMAN MANAGEMENT AND ALTMAN MANAGEMENT II**

178.    Plaintiffs incorporate by reference all other allegations in this Second Amended Complaint as though fully set forth herein.

179.    The crash and consequent deaths of the DECEDENTS was a foreseeable direct and proximate result of the willful, wanton, reckless, and/or grossly negligent misconduct of Defendants ALTMAN, LCA PARTNERSHIP, DA AERO, INC., ALTMAN MANAGEMENT and ALTMAN MANAGEMENT II in failing and refusing to protect those persons aboard the accident helicopter from known dangers of an extraordinary nature, posed by the unsafe aircraft operations as follows:

a)      Negligently entrusting the PIPER, a dangerous instrumentality, to a negligent pilot, ALTMAN;

b)      By failing to properly train and educate ALTMAN on the fundamentals of flight in the Hudson River corridor;

c)      By failing to observe the operative and applicable governmental regulations and directives pertaining to the operation of the subject PIPER;

d)     By failing to operate the aircraft in a safe and competent manner, thereby resulting in the crash in question;

e)     By failing to use all possible means, such as TCAS, anti-collision lights, monitoring and reporting on the CTAF, monitoring the ATC transmissions or any other means to make sure that the accident aircraft could see and be seen;

f)     By failing to use all available resources to insure the accident aircraft would remain clear of other aircraft;

g)     By violating various aviation regulations referenced hereinabove, namely, Federal Aviation Regulation Part 91.17; and

h)     By allowing the aircraft to collide with the helicopter, killing all aboard.

180.     The crash of the above-described flight on August 8, 2009, was caused by such known and reasonably foreseeable conditions.

181.     By reason of the above-stated acts of wanton, willful, reckless, and/or grossly-negligent conduct, evidencing willful and reckless indifference to the safety, welfare, health, security, and well-being of their passengers, and the passengers on the EUROCOPTER, including, the DECEDENTS in the face of known and notorious risks, the Defendants ALTMAN, LCA PARTNERSHIP, DA AERO, INC., ALTMAN MANAGEMENT and ALTMAN MANAGEMENT II, are each liable to the Plaintiff for exemplary damages.

<u>COUNT IX</u>
<u>WRONGFUL DEATH -- AGAINST ALTMAN, LCA PARTNERSHIP,</u>
<u>DA AERO, INC., ALTMAN MANAGEMENT AND</u>
<u>ALTMAN MANAGEMENT II</u>

182.    Plaintiffs incorporate by reference all other allegations in this Second Amended Complaint as though fully set forth herein.

183.    At all times material, Defendants ALTMAN, LCA PARTNERSHIP, DA AERO, INC., ALTMAN MANAGEMENT and ALTMAN MANAGEMENT II, owed a duty to all persons aboard the accident helicopter to operate and control the PIPER, on the ground and in the air, with the highest degree of care, and to exercise the highest degree of care to prevent injury of any kind, including injury and death as a result of known dangers.

184.    The air crash which occurred on August 8, 2009, and which resulted in the deaths of all on board, was a foreseeable direct and proximate result of the negligence and willful misconduct hereinafter alleged of Defendants ALTMAN, LCA PARTNERSHIP, DA AERO, INC., ALTMAN MANAGEMENT and ALTMAN MANAGEMENT II.

185.    Defendants ALTMAN, LCA PARTNERSHIP, DA AERO, INC., ALTMAN MANAGEMENT and ALTMAN MANAGEMENT II, by and through their agents, employees, and representatives, willfully and otherwise breached the duties owed to the DECEDENTS in some or all of, but not limited to, the following regards:

  a)    Negligently entrusting the PIPER, a dangerous instrumentality, to a negligent pilot, ALTMAN;

b)      By failing to properly train and educate ALTMAN on the fundamentals of flight in the Hudson River corridor;

c)      By failing to observe the operative and applicable governmental regulations and directives pertaining to the operation of the subject PIPER;

d)      By failing to operate the aircraft in a safe and competent manner, thereby resulting in the crash in question;

e)      By failing to use all possible means, such as TCAS, anti-collision lights, monitoring and reporting on the CTAF, monitoring the ATC transmissions or any other means to make sure that the accident aircraft could see and be seen;

f)      By failing to use all available resources to insure the accident aircraft would remain clear of other aircraft; and

g)      By allowing the aircraft to collide with the helicopter, killing all aboard.

WHEREFORE, Plaintiffs hereby demand judgment against the Defendants, jointly and severally, ALTMAN, LCA PARTNERSHIP, DA AERO, INC., ALTMAN MANAGEMENT and ALTMAN MANAGEMENT II for:

a)      all economic and non economic damages allowed by law;

b)      a measurable and significant period before and after the first and subsequent impacts as well as before the deaths of the DECEDENTS during which the DECEDENTS sustained significant personal injuries, including conscious and physical pain and suffering, pre and post impact fright and terror, fear of impending death, mental anguish, emotional distress, and other severe injuries, suffering, distress and harm for a measurable period of time prior to their deaths;

c)      mental and physical pain and suffering of the families and beneficiaries of the DECEDENTS;

d)      loss of consortium, society and love;

e)      loss of companionship, guidance, care, comfort and advice;

f)      loss of being allowed to live their lives and the enjoyment of their lives of the DECEDENTS;

g)      loss of enjoyment of life of the their surviving families and beneficiaries;

h)      loss of the value of living one's life and the value of life's pleasures;

i)      loss of the value of not having to live one's life alone;

j)      loss of the value of entire family and the loss of a spouse and minor child;

k)      loss of income;

l)      loss of support in money or kind;

m)      loss of services in money or in kind;

n)      loss of gross earning power and earning capacity;

o)      loss of past earnings;

p)      loss of future and prospective earnings;

q)      loss of inheritance;

r)      full pecuniary loss of the DECEDENTS;

s)      loss of prospective estate accumulations;

t)      grief, emotional distress, sorrow of the families and beneficiaries;

u)      funeral expenses, memorials and other expenses due to the deaths of the DECEDENTS;

v)      prejudgment interest;

w)      costs and attorneys fees; and

x)    any all other damages to which the DECEDENTS, and their representatives, estates, survivors and beneficiaries are lawfully entitled.

<u>COUNT X</u>
<u>FEDERAL MARITIME COMMON LAW --- SURVIVAL</u>
<u>AGAINST ALTMAN, LCA PARTNERSHIP, DA AERO, INC.,</u>
<u>DAVID ALTMAN, ALTMAN MANAGEMENT AND ALTMAN MANAGEMENT II</u>

186.    Plaintiffs incorporate by reference all other allegations in this Second Amended Complaint as though fully set forth herein.

187.    The crash of the EUROCOPTER as aforesaid in the navigable waters of the Hudson River was a maritime casualty under the general maritime law of the United States.

188.    At all times material hereto, the subject crash affected the maritime time activity of the Hudson River waterway in that the EUROCOPTER took off from a helipad abutting the Hudson River and the PIPER was following a traditional maritime rout along the Hudson River. Further the accident closed the Hudson River for a period of time after the crash affecting trade and commerce in the navigable waters of the Hudson River and elsewhere.

189.    At all times material ALTMAN owed a duty to foreseeable third parties, including all persons aboard the accident helicopter, to operate and control the PIPER, on the ground and in the air, with the highest degree of care, and to exercise the highest degree of care to prevent injury of any kind, including injury and death as a result of known dangers posed by the improperly operated PIPER.

190.   At all time material, ALTMAN MANAGEMENT and ALTMAN MANAGEMENT II owed a duty to foreseeable third parties, including all persons aboard the accident helicopter, as the employer and/or principal of its employee and/or agent ALTMAN, the operator of the PIPER.

191.   At all times material, LCA PARTNERSHIP and DA AERO, INC., were the owners of the PIPER, a dangerous instrumentality.

192.   At all times material, LCA PARTNERSHIP, DA AERO, INC., ALTMAN MANAGEMENT and ALTMAN MANAGEMENT II, permitted ALTMAN to operate the PIPER, a dangerous instrumentality.

193.   At all times material hereto, LCA PARTNERSHIP, DA AERO, INC., ALTMAN MANAGEMENT and ALTMAN MANAGEMENT II had a duty to ensure that ALTMAN operated the PIPER in a safe and prudent manner.

194.   The air crash which occurred on August 8, 2009 resulted in the significant pre-death fear, apprehension, physical, and psychological injuries to all on board the EUROCOPTER.

195.   The air crash which occurred on August 8, 2009 resulted in the deaths of all on board the EUROCOPTER, and each of Plaintiffs' DECEDENTS was a non-seafarer.

196.   The air crash which occurred on August 8, 2009, and which resulted in the deaths of all on board the PIPER and the EUROCOPTER, was a foreseeable, direct and proximate result of the negligence and willful misconduct alleged herein of ALTMAN.

197.    The air crash which occurred on August 8, 2009 resulted in the deaths of all on board the EUROCOPTER, and each of these pre-death injuries and deaths occurred within three nautical miles of shore.

198.    ALTMAN breached his duties to the DECEDENTS by violating various aviation regulations referenced hereinabove, namely, Federal Aviation Regulation Part 91.17.

199.    ALTMAN, LCA PARTNERSHIP, DA AERO, INC., ALTMAN MANAGEMENT and ALTMAN MANAGEMENT II by and through their agents, employees, and representatives, willfully and otherwise breached their duties owed to the DECEDENTS in some or all of, but not limited to, the following regards:

a)    Negligently entrusting the PIPER, a dangerous instrumentality, to a negligent pilot, ALTMAN;

b)    By failing to properly train and educate ALTMAN on the fundamentals of flight in the Hudson River corridor;

c)    By failing to observe the operative and applicable governmental regulations and directives pertaining to the operation of the subject PIPER;

d)    By failing to operate the aircraft in a safe and competent manner, thereby resulting in the crash in question;

e)    By failing to use all possible means, such as TCAS, anti-collision lights, monitoring and reporting on the CTAF, monitoring the ATC transmissions or any other means to make sure that the accident aircraft could see and be seen;

f)    By violating various aviation regulations referenced hereinabove, namely, Federal Aviation Regulation Part 91.17

g)    By failing to use all available resources to insure the accident aircraft would remain clear of other aircraft; and

h)    By allowing the aircraft to collide with the helicopter, killing all aboard.

WHEREFORE, Plaintiffs hereby demand judgment against the Defendants, jointly and severally, ALTMAN, LCA PARTNERSHIP, DA AERO, INC., ALTMAN MANAGEMENT and ALTMAN MANAGEMENT II for:

a)    all economic and non economic damages allowed by law;

b)    a measurable and significant period before and after the first and subsequent impacts as well as before the deaths of the DECEDENTS during which the DECEDENTS sustained significant personal injuries, including conscious and physical pain and suffering, pre and post impact fright and terror, fear of impending death, mental anguish, emotional distress, and other severe injuries, suffering, distress and harm for a measurable period of time prior to their deaths;

c)    mental and physical pain and suffering of the families and beneficiaries of the DECEDENTS;

d)    loss of consortium, society and love;

e)    loss of companionship, guidance, care, comfort and advice;

f)    loss of being allowed to live their lives and the enjoyment of their lives of the DECEDENTS;

g)    loss of enjoyment of life of the their surviving families and beneficiaries;

h)    loss of the value of living one's life and the value of life's pleasures;

i)    loss of the value of not having to live one's life alone;

j)    loss of the value of entire family and the loss of a spouse and minor child;

k)      loss of income;

l)      loss of support in money or kind;

m)      loss of services in money or in kind;

n)      loss of gross earning power and earning capacity;

o)      loss of past earnings;

p)      loss of future and prospective earnings;

q)      loss of inheritance;

r)      full pecuniary loss of the DECEDENTS;

s)      loss of prospective estate accumulations;

t)      grief, emotional distress, sorrow of the families and beneficiaries;

u)      funeral expenses, memorials and other expenses due to the deaths of the DECEDENTS;

v)      prejudgment interest;

w)      costs and attorneys fees; and

x)      any all other damages to which the DECEDENTS, and their representatives, estates, survivors and beneficiaries are lawfully entitled under a claim premised on a theory of general federal maritime survival jurisprudence as the beneficiaries of non-seafarers suffering fatal injuries and death within three nautical miles of shore.

## COUNT XI
## FEDERAL MARITIME COMMON LAW
## WILLFUL AND WANTON MISCONDUCT
## AGAINST ALTMAN, LCA PARTNERSHIP, DA AERO, INC.,
## ALTMAN MANAGEMENT AND ALTMAN MANAGEMENT II

200.   Plaintiffs incorporate by reference all other allegations in this Second Amended Complaint as though fully set forth herein.

201.   The air crash which occurred on August 8, 2009 resulted in the deaths of all on board the EUROCOPTER, and each of Plaintiffs' decedents was a non-seafarer.

202.   The air crash which occurred on August 8, 2009 resulted in the deaths of all on board the EUROCOPTER, and each of these deaths occurred within three nautical miles of shore.

203.   The crash and consequent deaths of the DECEDENTS was a foreseeable direct and proximate result of the willful, wanton, reckless, and/or grossly negligent misconduct of Defendants ALTMAN, LCA PARTNERSHIP, DA AERO, INC., ALTMAN MANAGEMENT and  ALTMAN MANAGEMENT II in failing and refusing to protect those persons aboard the accident helicopter from known dangers of an extraordinary nature, posed by the unsafe aircraft operations as follows:

   a)   Negligently entrusting the PIPER, a dangerous instrumentality, to a negligent pilot, ALTMAN;

   b)   By failing to properly train and educate ALTMAN on the fundamentals of flight in the Hudson River corridor;

   c)   By failing to observe the operative and applicable governmental regulations and directives pertaining to the operation of the subject PIPER;

   d)   By failing to operate the aircraft in a safe and competent manner, thereby resulting in the crash in question;

e)     By failing to use all possible means, such as TCAS, anti-collision lights, monitoring and reporting on the CTAF, monitoring the ATC transmissions or any other means to make sure that the accident aircraft could see and be seen;

f)     By failing to use all available resources to insure the accident aircraft would remain clear of other aircraft;

g)     By violating various aviation regulations referenced hereinabove, namely, Federal Aviation Regulation Part 91.17; and

h)     By allowing the aircraft to collide with the helicopter, killing all aboard.

204.    The crash of the above-described flight on August 8, 2009, was caused by such known and reasonably foreseeable conditions.

205.    By reason of the above-stated acts of wanton, willful, reckless, and/or grossly-negligent conduct, evidencing willful and reckless indifference to the safety, welfare, health, security, and well-being of their passengers, and the passengers on the EUROCOPTER, including, the DECEDENTS in the face of known and notorious risks, the Defendants ALTMAN, LCA PARTNERSHIP, DA AERO, INC., ALTMAN MANAGEMENT and ALTMAN MANAGEMENT II are each liable to the Plaintiffs for exemplary damages.

## COUNT XII
## FEDERAL MARITIME COMMON LAW --- WRONGFUL DEATH AGAINST ALTMAN, LCA PARTNERSHIP, DA AERO, INC., ALTMAN MANAGEMENT AND ALTMAN MANAGEMENT II

206.    Plaintiffs incorporate by reference all other allegations in this Second Amended Complaint as though fully set forth herein.

207.  The crash of the EUROCOPTER as aforesaid in the navigable waters of the Hudson River was a maritime casualty under the general maritime law of the United States.

208.  At all times material hereto, the subject crash affected the maritime time activity of the Hudson River waterway in that the EUROCOPTER took off from a helipad abutting the Hudson River, and the PIPER aircraft was following a traditional maritime route along the Hudson River. Further the accident restricted maritime traffic on the Hudson River for a period of time after the crash affecting trade and commerce in the navigable waters of the Hudson River and elsewhere.

209.  At all times material, Defendants ALTMAN, LCA PARTNERSHIP, DA AERO, INC., ALTMAN MANAGEMENT and  ALTMAN MANAGEMENT II owed a duty to all persons aboard the accident helicopter to operate and control the PIPER, on the ground and in the air, with the highest degree of care, and to exercise the highest degree of care to prevent injury of any kind, including injury and death as a result of known dangers.

210.  The air crash which occurred on August 8, 2009 resulted in the deaths of all on board the EUROCOPTER, and each of Plaintiffs' DECEDENTS was a non-seafarer.

211.  The air crash which occurred on August 8, 2009, and which resulted in the deaths of all on board, was a foreseeable direct and proximate result of the negligence and willful misconduct hereinafter alleged of Defendants ALTMAN, LCA

PARTNERSHIP, DA AERO, INC., ALTMAN MANAGEMENT and ALTMAN MANAGEMENT II.

212.   The air crash which occurred on August 8, 2009 resulted in the deaths of all on board the EUROCOPTER, and each of these deaths occurred within three nautical miles of shore.

213.   Defendants ALTMAN, LCA PARTNERSHIP, DA AERO, INC., ALTMAN MANAGEMENT and ALTMAN MANAGEMENT by and through their agents, employees, and representatives, willfully and otherwise breached their duties owed to the DECEDENTS in some or all of, but not limited to, the following regards:

   a)   Negligently entrusting the PIPER, a dangerous instrumentality, to a negligent pilot, ALTMAN;

   b)   By failing to properly train and educate ALTMAN on the fundamentals of flight in the Hudson River corridor;

   c)   By failing to observe the operative and applicable governmental regulations and directives pertaining to the operation of the subject PIPER;

   d)   By failing to operate the aircraft in a safe and competent manner, thereby resulting in the crash in question;

   e)   By failing to use all possible means, such as TCAS, anti-collision lights, monitoring and reporting on the CTAF, monitoring the ATC transmissions or any other means to make sure that the accident aircraft could see and be seen;

   f)   By violating various aviation regulations referenced hereinabove, namely, Federal Aviation Regulation Part 91.17;

g)   By failing to use all available resources to insure the accident aircraft would remain clear of other aircraft; and

h)   By allowing the aircraft to collide with the helicopter, killing all aboard.

WHEREFORE, Plaintiffs hereby demand judgment against the Defendants, jointly and severally, ALTMAN, LCA PARTNERSHIP, DA AERO, INC., ALTMAN MANAGEMENT and ALTMAN MANAGEMENT II for:

a)   all economic and non economic damages allowed by law;

b)   a measurable and significant period before and after the first and subsequent impacts as well as before the deaths of the DECEDENTS during which the DECEDENTS sustained significant personal injuries, including conscious and physical pain and suffering, pre and post impact fright and terror, fear of impending death, mental anguish, emotional distress, and other severe injuries, suffering, distress and harm for a measurable period of time prior to their deaths;

c)   mental and physical pain and suffering of the families and beneficiaries of the DECEDENTS;

d)   loss of consortium, society and love;

e)   loss of companionship, guidance, care, comfort and advice;

f)   loss of being allowed to live their lives and the enjoyment of their lives of the DECEDENTS;

g)   loss of enjoyment of life of the their surviving families and beneficiaries;

h)   loss of the value of living one's life and the value of life's pleasures;

i)   loss of the value of not having to live one's life alone;

j)   loss of the value of entire family and the loss of a spouse and minor child;

k)   loss of income;

l)   loss of support in money or kind;

m)   loss of services in money or in kind;

n)   loss of gross earning power and earning capacity;

o)   loss of past earnings;

p)   loss of future and prospective earnings;

q)   loss of inheritance;

r)   full pecuniary loss of the DECEDENTS;

s)   loss of prospective estate accumulations;

t)   grief, emotional distress, sorrow of the families and beneficiaries;

u)   funeral expenses, memorials and other expenses due to the deaths of the DECEDENTS;

v)   prejudgment interest;

w)   costs and attorneys fees; and

x)   any all other damages to which the DECEDENTS, and their representatives, estates, survivors and beneficiaries are lawfully entitled a claim premised on a theory of general federal maritime wrongful death jurisprudence as the beneficiaries of non-seafarers suffering fatal injuries and death within three nautical miles of shore.

## COUNT XIII
## NEGLIGENCE AGAINST THE UNITED STATES OF AMERICA
## (FEDERAL TORT CLAIMS ACT)

214.   Plaintiffs incorporate by reference all other allegations in this Second Amended Complaint as though fully set forth herein.

215.    At all times relevant to this accident, the TEB ATC tower facility was authorized to be staffed with five air traffic controllers.

216.    At all times relevant to the accident, there were only two air traffic controllers working in the TEB tower cab.

217.    At all times relevant to the accident, two TEB assigned air traffic controllers were on break.

218.    At all times relevant to the accident, the Front Line Manager had left the TEB premises, informing nobody of his whereabouts and was unable to be reached even after the accident by cell phone.

219.    From two minutes after he cleared the PIPER for takeoff, and continuing through the time of the accident, the TEB LC/GC was conducting a personal telephone conversation unrelated to his air traffic control duties and in derogation of his responsibilities to provide VFR flight following as requested by the PIPER pilot and mandated in FAA Order 7110.65.

220.    At all times relevant to this accident, the Front Line Manager was unavailable to provide monitoring and situational awareness in the TEB tower cab, including monitoring of potential traffic conflicts and monitoring and policing of the unauthorized and non-business related conversations that the TEB LC/GC engaged in during the whole of the accident sequence.

221.    The TEB Front Line Manager's behavior was negligent, grossly negligent, reckless and wanton, in that he:

    a)    Intentionally abandoned his duty position when not authorized to do so;

b)      Abandoned his duty position to conduct personal business on government time;

c)      Failed to inform other FAA employees of his whereabouts during his absence to perform personal errands;

d)      Failed to monitor the traffic situation in the TEB vicinity during his absence;

e)      Failed to supervise and correct the TEB LC/GC who was on a personal call during the entirety of the accident sequence instead of devoting his time efforts and attention to the air traffic control responsibilities;

f)      Permitted air traffic controllers under his supervision to violate FAA Orders and TEB Standard Operating Procedures; and

g)      Violated numerous sections of the Air Traffic Control Procedures Manual, in effect on August 8, 2009 (the "ATC Manual"), including but not limited to, those sections and paragraphs of the ATC Manual, concerning the duty to provide required traffic advisories to the pilot of the subject PIPER aircraft concerning potential other traffic conflicts, as well as the requirement of attention to duty as opposed to being distracted by a personal telephone call which was a flagrant violation of the duties and responsibilities of an on-duty air traffic controller who is providing air traffic control services to aircraft.

222.    Said failures and violations of the ATC Manual, as well as the flagrant inattention to duty was the foreseeable, direct and proximate cause, in whole or in part, the mid-air collision and the injuries to and deaths of the DECEDENTS.

223.    The TEB Front Line Manager's negligent, grossly negligent, reckless and wanton behavior was a substantial contributing factor to and a foreseeable, direct and proximate cause of the death of the DECEDENTS and the damages sustained thereby.

224.    The TEB LC/GC's behavior was negligent, grossly negligent, reckless and wanton, in that the TEB LC/GC:

a)    Due to complacency, inattention or distraction, failed to provide the VFR flight following requested by the PIPER pilot in compliance with the strictures of FAA Order 7110.65;

b)    Due to complacency, inattention or distraction, failed to timely hand the PIPER pilot off to Newark controllers;

c)    Due to complacency, inattention or distraction, failed to detect an improper frequency read back by the PIPER pilot during the belated hand off to Newark;

d)    Due to complacency, inattentiveness or distraction, failed to notice a traffic conflict and/or take any action to resolve it;

e)    Due to complacency, inattentiveness or distraction, failed to update the PIPER's departure strip, or provide the PIPER pilot with the proper frequency for a southeast departure; and

f)    During the entirety of the events leading to the accident, engaged in a personal phone call while simultaneously, ineffectively and dangerously acting as, and in clear violation of FAA and TEB rules and regulations, the LC/GC and CIC in the TEB tower, in derogation of his duties to the flying public, and in particular, those nine (9) who perished that day, including the DECEDENTS.

WHEREFORE, Plaintiffs hereby demand judgment against the Defendant,

THE UNITED STATES OF AMERICA (FAA) for:

a)    all economic and non-economic damages allowed by law;

b)    a measurable and significant period before and after the first and subsequent impacts as well as before the deaths of the DECEDENTS during which the DECEDENTS sustained significant personal injuries, including conscious and physical pain and suffering, pre and post impact fright and terror, fear of impending death, mental

anguish, emotional distress, and other severe injuries, suffering, distress and harm for a measurable period of time prior to their deaths;

c)    mental and physical pain and suffering of the families and beneficiaries of the DECEDENTS;

d)    loss of consortium, society and love;

e)    loss of companionship, guidance, care, comfort and advice;

f)    loss of being allowed to live their lives and the enjoyment of their lives of the DECEDENTS;

g)    loss of enjoyment of life of the their surviving families and beneficiaries;

h)    loss of the value of living one's life and the value of life's pleasures;

i)    loss of the value of not having to live one's life alone;

j)    loss of the value of entire family and the loss of a spouse and minor child;

k)    loss of income;

l)    loss of support in money or kind;

m)    loss of services in money or in kind;

n)    loss of gross earning power and earning capacity;

o)    loss of past earnings;

p)    loss of future and prospective earnings;

q)    loss of inheritance;

r)    full pecuniary loss of the DECEDENTS;

s)    loss of prospective estate accumulations;

t)      grief, emotional distress, sorrow of the families and beneficiaries;

u)      funeral expenses, memorials and other expenses due to the deaths of the DECEDENTS;

v)      prejudgment interest;

w)      costs and attorneys fees; and

x)      any all other damages to which the DECEDENTS, and their representatives, estates, survivors and beneficiaries are lawfully entitled.

<u>COUNT XIV</u>
<u>NEGLIGENCE AGAINST THE UNITED STATES OF AMERICA</u>
<u>(SUITS IN ADMIRALTY ACT)</u>

225.    Plaintiffs incorporate by reference all other allegations in this Second Amended Complaint as though fully set forth herein.

226.     At all times relevant to this accident, the TEB ATC tower facility was authorized to be staffed with five air traffic controllers.

227.    At all times relevant to the accident, there were only two air traffic controllers working in the TEB tower cab.

228.    At all times relevant to the accident, two TEB assigned air traffic controllers were on break.

229.    At all times relevant to the accident, the Front Line Manager had left the TEB premises, informing nobody of his whereabouts and was unable to be reached even after the accident by cell phone.

230.    From two minutes after he cleared the PIPER for takeoff, and continuing through the time of the accident, the TEB LC/GC was conducting a personal telephone conversation unrelated to his air traffic control duties and in

75

derogation of his responsibilities to provide VFR flight following as requested by the PIPER pilot and mandated in FAA Order 7110.65.

231.    At all times relevant to this accident, the Front Line Manager was unavailable to provide monitoring and situational awareness in the TEB tower cab, including monitoring of potential traffic conflicts and monitoring and policing of the unauthorized and non-business related conversations that the TEB LC/GC engaged in during the whole of the accident sequence.

232.    The TEB Front Line Manager's behavior was negligent, grossly negligent, reckless and wanton, in that he:

a)    Intentionally abandoned his duty position when not authorized to do so;

b)    Abandoned his duty position to conduct personal business on government time;

c)    Failed to inform other FAA employees of his whereabouts during his absence to perform personal errands;

d)    Failed to monitor the traffic situation in the TEB vicinity during his absence;

e)    Failed to supervise and correct the TEB LC/GC who was on a personal call during the entirety of the accident sequence instead of devoting his time efforts and attention to the air traffic control responsibilities;

f)    Permitted air traffic controllers under his supervision to violate FAA Orders and TEB Standard Operating Procedures; and

g)    Violated numerous sections of the Air Traffic Control Procedures Manual, in effect on August 8, 2009 (the "ATC Manual"), including but not limited to, those sections and paragraphs of the ATC Manual, concerning the duty to provide required traffic advisories to the pilot of the

subject PIPER aircraft concerning potential other traffic conflicts, as well as the requirement of attention to duty as opposed to being distracted by a personal telephone call which was a flagrant violation of the duties and responsibilities of an on-duty air traffic controller who is providing air traffic control services to aircraft.

233.    Said failures and violations of the ATC Manual, as well as the flagrant inattention to duty was a foreseeable, direct and proximate cause, in whole or in part, of the mid-air collision and the injuries to and deaths of the DECEDENTS.

234.    The TEB Front Line Manager's negligent, grossly negligent, reckless and wanton behavior was a substantial contributing factor to and a foreseeable, direct and proximate cause of the death of the DECEDENTS and the damages sustained thereby.

235.    The TEB LC/GC's behavior was negligent, grossly negligent, reckless and wanton, in that the TEB LC/GC:

a)    Due to complacency, inattention or distraction, failed to provide the VFR flight following requested by the PIPER pilot in compliance with the strictures of FAA Order 7110.65;

b)    Due to complacency, inattention or distraction, failed to timely hand the PIPER pilot off to Newark controllers;

c)    Due to complacency, inattention or distraction, failed to detect an improper frequency read back by the PIPER pilot during the belated hand off to Newark;

d)    Due to complacency, inattentiveness or distraction, failed to notice a traffic conflict and/or take any action to resolve it;

e)    Due to complacency, inattentiveness or distraction, failed to update the PIPER's departure strip, or provide the

PIPER pilot with the proper frequency for a southeast departure; and

f)    During the entirety of the events leading to the accident, engaged in a personal phone call while simultaneously, ineffectively and dangerously acting as, and in clear violation of FAA and TEB rules and regulations, the LC/GC and CIC in the TEB tower, in derogation of his duties to the flying public, and in particular, those nine (9) who perished that day, including the DECEDENTS.

WHEREFORE, Plaintiffs hereby demand judgment against the Defendant,

THE UNITED STATES OF AMERICA for:

a)    all economic and non-economic damages allowed by law;

b)    a measurable and significant period before and after the first and subsequent impacts as well as before the deaths of the DECEDENTS during which the DECEDENTS sustained significant personal injuries, including conscious and physical pain and suffering, pre and post impact fright and terror, fear of impending death, mental anguish, emotional distress, and other severe injuries, suffering, distress and harm for a measurable period of time prior to their deaths;

c)    mental and physical pain and suffering of the families and beneficiaries of the DECEDENTS;

d)    loss of consortium, society and love;

e)    loss of companionship, guidance, care, comfort and advice;

f)    loss of being allowed to live their lives and the enjoyment of their lives of the DECEDENTS;

g)    loss of enjoyment of life of the their surviving families and beneficiaries;

h)    loss of the value of living one's life and the value of life's pleasures;

i)    loss of the value of not having to live one's life alone;

j)      loss of the value of entire family and the loss of a spouse and minor child;

k)      loss of income;

l)      loss of support in money or kind;

m)      loss of services in money or in kind;

n)      loss of gross earning power and earning capacity;

o)      loss of past earnings;

p)      loss of future and prospective earnings;

q)      loss of inheritance;

r)      full pecuniary loss of the DECEDENTS;

s)      loss of prospective estate accumulations;

t)      grief, emotional distress, sorrow of the families and beneficiaries;

u)      funeral expenses, memorials and other expenses due to the deaths of the DECEDENTS;

v)      prejudgment interest;

w)      costs and attorneys fees; and

x)      any all other damages to which the DECEDENTS, and their representatives, estates, survivors and beneficiaries are lawfully entitled.

## COUNT XV
### *RESPONDEAT SUPERIOR*
## AGAINST ALTMAN MANAGEMENT AND ALTMAN MANAGEMENT II

236.    Plaintiffs incorporate by reference all other allegations in this Second Amended Complaint as though fully set forth herein.

237.   At all material times, upon information and belief, ALTMAN was an employee and/or agent of ALTMAN MANAGEMENT and ALTMAN MANAGEMENT II, acting within his scope of employment and/or his authority.

238.   ALTMAN negligently, carelessly, and recklessly failed to adhere to Federal Aviation Regulation 14 C.F.R. § 91.113(b), which states, "[w]hen weather conditions permit, regardless of whether an operation is conducted under instrument flight rules or visual flight rules, vigilance shall be maintained by each person operating an aircraft so as to see and avoid other aircraft."

239.   ALTMAN negligently, carelessly, and recklessly failed to adhere to Federal Aviation Regulation 14 C.F.R. § 91.111(a) which states, "no person may operate an aircraft so close to another aircraft as to create a collision hazard."

240.   ALTMAN negligently failed to properly prepare for his flight, including to check, know, notate, program equipment or have on board his plane materials or manuals during his flight to enable him to properly enter the correct frequencies needed during his flight.

241.   ALTMAN's negligent misconduct and various aviation regulation violations referenced hereinabove, namely, Federal Aviation Regulation Part 91.17 are imputed to ALTMAN MANAGEMENT under the doctrine of *respondeat superior*, and under principles of agency.

242.   ALTMAN's negligent, grossly negligent, reckless and wanton behavior was a substantial contributing factor to and a foreseeable, direct and proximate cause of the death of the DECEDENTS and the damages sustained thereby.

WHEREFORE, Plaintiffs hereby demand judgment against the Defendants, jointly and severally, ALTMAN MANAGEMENT and  ALTMAN MANAGEMENT II for:

a)  all economic and non-economic damages allowed by law;

b)  a measurable and significant period before and after the first and subsequent impacts as well as before the deaths of the DECEDENTS during which the DECEDENTS sustained significant personal injuries, including conscious and physical pain and suffering, pre and post impact fright and terror, fear of impending death, mental anguish, emotional distress, and other severe injuries, suffering, distress and harm for a measurable period of time prior to their deaths;

c)  mental and physical pain and suffering of the families and beneficiaries of the DECEDENTS;

d)  loss of consortium, society and love;

e)  loss of companionship, guidance, care, comfort and advice;

f)  loss of being allowed to live their lives and the enjoyment of their lives of the DECEDENTS;

g)  loss of enjoyment of life of the their surviving families and beneficiaries;

h)  loss of the value of living one's life and the value of life's pleasures;

i)  loss of the value of not having to live one's life alone;

j)  loss of the value of entire family and the loss of a spouse and minor child;

k)  loss of income;

l)  loss of support in money or kind;

m)  loss of services in money or in kind;

n)    loss of gross earning power and earning capacity;

o)    loss of past earnings;

p)    loss of future and prospective earnings;

q)    loss of inheritance;

r)    full pecuniary loss of the DECEDENTS;

s)    loss of prospective estate accumulations;

t)    grief, emotional distress, sorrow of the families and beneficiaries;

u)    funeral expenses, memorials and other expenses due to the deaths of the DECEDENTS;

v)    prejudgment interest;

w)    costs and attorneys fees; and

x)    any all other damages to which the DECEDENTS, and their representatives, estates, survivors and beneficiaries are lawfully entitled.

<u>COUNT XVI</u>
<u>*RES IPSA LOQUITOR* AGAINST MERIDIAN, LIBERTY, ALTMAN, LCA PARTNERSHIP, DA AERO, INC., UNITED STATES OF AMERICA, ALTMAN MANAGEMENT AND ALTMAN MANAGEMENT II</u>

243.    Plaintiffs incorporate by reference all other allegations in this Second Amended Complaint as though fully set forth herein.

244.    The DECEDENTS were fare-paying passengers on a helicopter for hire for the purpose of a sight-seeing tour of New York City.

245.    The EUROCOPTER collided with a fixed wing PIPER and crashed, killing the DECEDENTS.

246.   The DECEDENTS were factually and legally without fault in the accident.

247.   Absent the negligence of one or all of the Defendants, such a mid-air collision would not occur.

248.   The EUROCOPTER was under the exclusive control and management of LIBERTY and MERIDIAN.

249.   The PIPER was under the exclusive control and management of ALTMAN, LCA PARTNERSHIP, DA AERO, INC., ALTMAN MANAGEMENT and ALTMAN MANAGEMENT II.

250.   Air traffic control and aircraft separation were under the exclusive control and management of the UNITED STATES OF AMERICA'S Federal Aviation Administration.

251.   Negligence of all of the Defendants can be inferred by the collision, because an accident such as this does not normally occur without negligence, and because the Defendants exercised exclusive control and management over the dangerous instrumentalities that caused the collision.

252.   The horrific crash of the aircraft and the deaths of the DECEDENTS is a *res ipsa loquitur* demonstration of negligence.

WHEREFORE, Plaintiffs hereby demand judgment against the Defendants, jointly and severally,  LIBERTY, MERIDIAN, ALTMAN, LCA PARTNERSHIP, DA AERO, INC., the UNITED STATES OF AMERICA, ALTMAN MANAGEMENT and ALTMAN MANAGEMENT II for:

a)      all economic and non-economic damages allowed by law;

b)      a measurable and significant period before and after the first and subsequent impacts as well as before the deaths of the DECEDENTS during which the DECEDENTS sustained significant personal injuries, including conscious and physical pain and suffering, pre and post impact fright and terror, fear of impending death, mental anguish, emotional distress, and other severe injuries, suffering, distress and harm for a measurable period of time prior to their deaths;

c)      mental and physical pain and suffering of the families and beneficiaries of the DECEDENTS;

d)      loss of consortium, society and love;

e)      loss of companionship, guidance, care, comfort and advice;

f)      loss of being allowed to live their lives and the enjoyment of their lives of the DECEDENTS;

g)      loss of enjoyment of life of the their surviving families and beneficiaries;

h)      loss of the value of living one's life and the value of life's pleasures;

i)      loss of the value of not having to live one's life alone;

j)      loss of the value of entire family and the loss of a spouse and minor child;

k)      loss of income;

l)      loss of support in money or kind;

m)      loss of services in money or in kind;

n)      loss of gross earning power and earning capacity;

o)      loss of past earnings;

p)      loss of future and prospective earnings;

q)      loss of inheritance;

r)      full pecuniary loss of the DECEDENTS;

s)      loss of prospective estate accumulations;

t)      grief, emotional distress, sorrow of the families and beneficiaries;

u)      funeral expenses, memorials and other expenses due to the deaths of the DECEDENTS;

v)      prejudgment interest;

w)      costs and attorneys fees; and

x)      any all other damages to which the DECEDENTS, and their representatives, estates, survivors and beneficiaries are lawfully entitled.

WHEREFORE, Plaintiffs demand judgment against all Defendants, and each of them, jointly and severally, as hereinafter set forth:

a)      For all compensatory and economic damages, as allowed by law for wrongful death and survival damages, and for all non-economic damages as allowed by law for suffering of the above-named decedents, their estates, beneficiaries and next-of-kin in an amount according to proof at trial;

b)      For property damage, loss of use of property and estate damages according to proof;

c)      For exemplary damages as allowed by law;

d)      For pre-judgment interest as provided by law;

e)      For costs of suit incurred herein;

f)      For attorneys fees as allowed by law;

g)      That all issues of fact in this matter be determined by a jury; and

85

h)     For such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand trial by jury on all issues so triable.  Furthermore, as against the UNITED STATES OF AMERICA, if trial by jury is not permitted, then an advisory jury is requested.

Respectfully submitted,

**COLLIER & BASIL P.C.**

By:     s/ Robert Basil
        Robert Basil, Esq.
        1270 Broadway, Suite 305
        New York, NY 10001
        Telephone:   (917) 512-3066
        Facsimile:    (831) 536-1075
        robertjbasil@collierbasil.com

**MOTLEY RICE LLC**

By:     s/ Mary Schiavo
        Mary Schiavo, Esq. (*Pro Hac Vice*)
        28 Bridgeside Blvd.
        P.O. Box 1792 (29465)
        Mount Pleasant, SC 29464
        Telephone    (843) 216-9138
        Facsimile     (843) 216-9440
        mschiavo@motleyrice.com

DATED:     October 13, 2010

## SERVICE LIST

| | |
|---|---|
| Steven. J. Riegel, Esq.<br>Barry F. Benson, Esq.<br>Daniel J. Gibbons, Esq.<br>U.S. Department of Justice<br>Civil Division, Torts Branch<br>PO Box 14271<br>Washington, DC 20044-4271<br>Telephone: (202)616-4049<br>Facsimile:  (202) 616-4002<br>Steven.riegel@usdoj.gov<br>daniel.gibbons@usdoj.gov<br>barry.benson@usdoj.gov<br><br>*Attorneys for United States of America* | Peter B. Van Deventer, Jr., Esq.<br>Douglas H. Amster, Esq.<br>LECLAIR RYAN, P.C.<br>One Riverfront Plaza<br>1037 Raymond Blvd.<br>Newark, NJ 07102<br>Telephone: (973) 491-3600<br>Facsimile:  (973)<br>Douglas.amster@leclairryan.com<br>Peter.vandeventer@leclairryan.com<br><br>*Attorneys for Liberty Helicopters, Inc. &*<br>*Meridian Consulting I Corporation, Inc.* |
| Daniel R. Lindemann, Esq.<br>LINDEMANN, LLC<br>VIP Office Centre<br>41 Vreeland Avenue<br>Totowa, NJ  07512<br>Telephone:  (973) 256-1222<br>Facsimile:   (973) 256-1222<br>drl@lindemann-lw.com<br><br>J. Thompson Thornton, Esq.<br>Patricia A. Leid, Esq.<br>Thornton, Davis & Fein, P.A.<br>80 S.W. 8th Street, Suite 2900<br>Miami, FL 33130<br>Telephone: (305) 446-2646<br>Facsimile:  (305) 441-2374<br>thornton@tdflaw.com<br>leid@tdflaw.com<br><br>*Attorneys for LCA Partnership,*<br>*Estate of Steven M. Altman, Pamela*<br>*Altman, David H. Altman &*<br>*DA Aero, Inc.* | |