COLLIER & BASIL P.C.
Robert Basil, Esq.
1270 Broadway, Suite 305
New York, NY 10001
(917) 512-3066
Attorney for Plaintiffs

MOTLEY RICE LLC
Mary Schiavo, Esq.
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
(843) 216-9138
Attorney for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
NEWARK DIVISION

CASE NO.: 2:09-CV-06142-DMC-JAD

| | |
|---|---|
| *In Re Hudson River Mid-Air Collision on August 8, 2009* | *Consolidated For Discovery Purposes Only*<br><br>**Relates to:**<br>*Case No. 09-CV-06142-DMC-JAD* |

**GALLAZZI PLAINTIFFS' RESPONSE TO ALTMAN DEFENDANTS MOTION TO
DISMISS COUNTS X THROUGH XII OF SECOND AMENDED COMPLAINT
FOR LACK OF SUBJECT MATTER JURISDICTION**

**AND**

**GALLAZZI PLAINTIFFS' RESPONSE TO DEFENDANTS
LIBERTY HELICOPTERS, INC.'S AND MERIDIAN CONSULTING I
CORPORATION, INC.'S MOTION TO DISMISS ADMIRALTY AND MARITIME
CLAIMS ALLEGED IN SECOND AMENDED COMPLAINT**

# Table of Contents

I.      PRELIMINARY STATEMENT ................................................................................... 4

II.     ARGUMENT ............................................................................................................. 5

        A.    STANDARD FOR DISMISSAL UNDER 12(B)(1) ........................................... 5

        B.    PLAINTIFF'S ADMIRALTY AND MARITIME CLAIMS ARE PROPER AS
              THE ACCIDENT OCCURRED OVER NAVIGABLE WATERS AND IS
              CONNECTTED TO MARITIME ACTIVITY ....................................................... 5

        C.    PLAINTIFFS' MEET THE LOCALITY TEST AS THE INCIDENT  TOOK
              PLACE ENTIRELY OF THE HUDSON RIVER. ................................................. 9

        D.    THE GENERAL CHARACTER OF THE HELICOPTER TOUR GIVING
              RISE TO THE ACCIDENT BEARS A SIGNIFICANT RELATIONSHIP TO
              TRADITIONAL MARITIME ACTIVITY. ........................................................... 10

        E.    THE ACCIDENT DID RESULT IN A DISRUPTIVE IMPACT ON
              COMMERCIAL MARITIME ACTIVITIES. ....................................................... 14

III.    CONCLUSION .......................................................................................................... 15

## TABLE OF AUTHORITIES

### CASES

Canavan v. Beneficial Finance Corp.
 553 F.2d 860, 865 (3rd Cir. 1977).................................................................................... 5


Defenders of Wildlife v. Lujan
504 U.S. 555, 561 (1992)................................................................................................. 5


Executive Jet Aviation, Inc. v. Cleveland
409 U.S. 249 (1972).................................................................................... 6, 7, 9, 12


Foremost Ins. Co. v. Richardson
457 U.S. 668, 73 L. Ed. 2d 300, 102 S. Ct. 2654 (1982)..................................... 7, 8, 14


Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.
513 U.S. 527, 534, 115 S. Ct. 1043, 130 L. Ed. 2d 1024 (1995)........................ 6, 11, 13


Lujan v. National Wildlife Federation
497 U.S. 871, 889 (1990)................................................................................................. 5


Neely v. Club Med Mgmt. Servs., Inc.
63 F.3d 166, 179 (3d Cir. 1995) ................................................................................. 6


Sisson v. Ruby
497 U.S. 358, 110 S.Ct. 2892, 111 L. Ed. 2d 292 (1990)........................... 7, 8, 9, 11, 14


The Daniel Ball
77 U.S. (10 Wall) at 563.................................................................................................. 9


The Propellor Genesee Chief v. Fitzhugh
53 U.S. (12 How) at 451, 455.......................................................................................... 9

COME NOW the Gallazzi Plaintiffs (Gallazzi) responding to the Altman Defendants' Motion to Dismiss Counts X Through XII of Gallazzi Plaintiffs' Second Amended Complaint for Lack of Subject Matter Jurisdiction, [DE 82] and Defendants Liberty Helicopters, Inc.'s and Meridian Consulting I Corporation, Inc.'s Motion to Dismiss Admiralty and Maritime Claims Alleged In Second Amended Complaint. [DE 88]  Although multiple Defendant's have filed Motions to Dismiss the admiralty and maritime claims of Gallazzi, Gallazzi, in an effort to provide judicial economy, files this one response in addressing the Motions to Dismiss of the multiple Defendants.

I.    **PRELIMINARY STATEMENT**

Gallazzi Plaintiffs were passengers on a sightseeing helicopter owned and operated by Defendants Liberty and Meridian.  The helicopter took off from the West 30th Street Heliport located in Manhattan, New York on August 8, 2009.  The scheduled route of flight was from the heliport, west across the river, south down the river, around the Statue of Liberty, north up the river, back to the west at the George Washington Bridge, south down the river, back to the heliport.  The entire flight was to occur over the Hudson River.  While making the initial turn to the south after departure, the helicopter was involved in a mid-air collision with a Piper aircraft being flown by Steven Altman.  After the collision, both aircraft fell from the sky crashing and sinking into the Hudson River.  As a result of the mid-air collision and subsequent crash into the water, all of the Gallazzi Plaintiffs were

killed.   The United States Coast Guard, the United States Army Corps of Engineers, and various other federal, state, and local agencies assisted in the recovery of wreckage and bodies of the deceased from the Hudson River.

II.   **ARGUMENT**

   A.   STANDARD FOR DISMISSAL UNDER 12(B)(1)

"The party invoking federal jurisdiction bears the burden of establishing the requisite elements." *Defenders of Wildlife v. Lujan,* 504 U.S. 555, 561 (1992) (citations omitted).  The burden on Plaintiffs is commensurate "with the manner and degree of evidence required at the successive stages of the litigation." *Id.* At the pleading stage, "general factual allegations . . . may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Id.* (quoting *Lujan v. National Wildlife Federation,* 497 U.S. 871, 889 (1990).

"Ordinarily when a defendant moves to dismiss for lack of jurisdiction, either party should be allowed discovery on the factual issues raised by that motion." *Canavan v. Beneficial Finance Corp.,* 553 F.2d 860, 865 (3rd Cir. 1977) (internal citation omitted) (holding "that refusal of the district court to permit plaintiff discovery of jurisdictional facts was inconsistent with the sound exercise of judicial discretion.")

   B.   PLAINTIFF'S ADMIRALTY AND MARITIME CLAIMS ARE
        PROPER AS THE ACCIDENT OCCURRED OVER NAVIGABLE
        WATERS AND IS CONNECTTED TO MARITIME ACTIVITY

"[A] party seeking to invoke federal admiralty jurisdiction pursuant to . . . § 1333(1) over a tort claim must satisfy conditions both of location and of connection with maritime activity." *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534, 115 S. Ct. 1043, 130 L. Ed. 2d 1024 (1995); *see also Neely v. Club Med Mgmt. Servs., Inc.*, 63 F.3d 166, 179 (3d Cir. 1995). The Supreme Court has approved criteria to determine whether admiralty jurisdiction and general maritime law apply to a tort action, namely: (1) did the accident occur on or over navigable waters; (2) did the general character of the activity giving rise to the accident bear a significant relationship to traditional maritime activity; and (3) did the accident have a potentially disruptive impact on maritime activity. In the present case, all three prongs are met and as such it is proper that general maritime law be applied to the present case.

For many years the only analysis employed by the courts was the locality or situs test, namely, where did the tort occur. In 1972, the Supreme Court in the case of *Executive Jet Aviation, Inc. v. Cleveland*, 409 U.S. 249 (1972) the Supreme Court reconsidered the usefulness of the locality rule. In *Executive Jet*, the Supreme Court declined to rely on the locality test exclusively in determining maritime tort jurisdiction, instead choosing to adopt an additional maritime nexus requirement. In *Executive Jet*, an aircraft crashed into the navigable waters of Lake Erie after striking a flock of sea gulls while taking off. The Supreme Court, required a second element be established, holding that jurisdiction was lacking despite the fact that

the crash had taken place in navigable waters because "the wrong [did not] bear a significant relationship to traditional maritime activity." *Id* at 266-268.

Ten years following the *Executive Jet* decision, the Supreme Court further expanded its holding in relation to maritime cases in two ways in *Foremost Ins. Co. v. Richardson*, 457 U.S. 668, 73 L. Ed. 2d 300, 102 S. Ct. 2654 (1982). First, the Court extended its maritime nexus test to encompass all cases involving the determination of maritime tort jurisdiction. *Id.* at 673-674. Second, the Court added another prong to the nexus test, holding that the injury must have a potentially disruptive impact on maritime commerce. In so holding, the court emphasized that a substantial relationship with *commercial* maritime activity is not necessary to a finding of maritime jurisdiction. *Id.* at 674-675.

In *Foremost*, two pleasure boats collided in navigable waters. Finding admiralty jurisdiction to exist, the Court held that when a "potential hazard to maritime commerce arises out of activity that bears a substantial relationship to traditional maritime activity, . . . admiralty jurisdiction is appropriate." *Id.* at 675, n. 5. The Court found that navigation of the boats constituted an activity that bore a substantial relationship to traditional maritime activity. *Id.* at 677.

Eight years following the *Foremost* decision, the Supreme Court clarified admiralty jurisdictional analysis. *Sisson v. Ruby*, 497 U.S. 358, 110 S.Ct. 2892, 111 L. Ed. 2d 292 (1990). In *Sisson*, a fire started on a noncommercial vessel docked at a marina and spread to other recreational vessels and the marina. No commercial vessels were docked at the marina at the time of the fire. Using *Foremost*'s three-

7

part test, the Court found admiralty jurisdiction to exist. *Id*, 110 S.Ct. at 2898. The Court held that in addition to satisfying the locality requirement, the tort must occur on the navigable waters and the incident must have a potentially disruptive impact on maritime commerce and the activity giving rise to the incident must have a substantial relationship to traditional maritime activity in order to come under federal maritime jurisdiction. *Id*.

Although the Court restated the nexus requirements set forth in *Foremost*, the Court further set out the manner in which the analysis should be administered. The Court directed lower courts to utilize a more general inquiry and to cease the fact-specific inquires under the two pronged nexus test.  Under the first prong of the nexus test, requiring the incident to have a potentially disruptive impact on traditional maritime activities, a court must look to the general character of the potential impact.  *Id.*, 110 S.Ct. at 2896. This jurisdictional inquiry is not to turn on the *actual* effects of the incident on maritime commerce, nor the particular facts of the incident that may have rendered the incident more or less likely to disrupt commercial activity. *Id*. "Rather, a court must assess the general features of the type of incident involved to determine whether such an incident is likely to disrupt commercial activity." *Id*. The Court found that the general features in *Sisson* -- a fire on a vessel docked at a marina on navigable waters -- plainly satisfied the requirement of potential disruption to commercial maritime activity. *Id*.

Specifically the Court stated when analyzing whether there is a substantial relationship between the activity giving rise to the incident and traditional

maritime activity, courts must define the activity by the general conduct from which

the incident arose, not the particular circumstances of the incident. *Id.*, 110 S.Ct. at

2897.  The Court found the activity that gave rise to the cause of action was the

storage and maintenance of a boat at a marina, not the fire.  As such, the storage

and maintenance of a boat at a marina bore a substantial relationship to traditional

maritime activity.  *Id.*

C.    **PLAINTIFFS' MEET THE LOCALITY TEST AS THE INCIDENT TOOK PLACE ENTIRELY OF THE HUDSON RIVER.**

The present action is a result of a mid-air collision between a Eurocopter

helicopter and a Piper aircraft, which occurred over the Hudson River.  Although

Defendants seem to concede the accident occurred over navigable waters, Gallazzi

Plaintiffs offer the following in support of this court applying general maritime law.

To qualify as a "navigable waterway" within the meaning of admiralty law, a body

of water must be either (1) actually used or susceptible of use for commercial

navigation, or (2) subject to the ebb and flow of the tide.  *Executive Jet; The Daniel

Ball*, 77 U.S. (10 Wall) at 563; *The Propellor Genesee Chief v. Fitzhugh*, 53 U.S. (12

How) at 451, 455.  The Hudson River undeniably meets both of these criteria.

The Hudson River is a component of the New York Bay, which turn is an

element of the Port of New York and New Jersey.  The Port of New York and New

Jersey is third largest port by tonnage in the United States and the largest port on

the east coast.[1]  The Hudson River is patrolled and regulated by the United States Coast Guard, specifically the unit based out of Staten Island, New York.  The Hudson River provides a navigable waterway between the Port of New York and New Jersey and upstate New York.  The United States Coast Guard routinely engages in ice breaking operations to maintain those commercial lanes from the Port of New York and New Jersey.  The Coast Guard estimates an average of 300 vessels transit the Hudson River during the winter months, carrying over of five million barrels of petroleum products to the northern regions of New York State.[2]

The lower Hudson River, where this incident occurred is a tidal estuary.[3]  It is well known the tides and currents of the Hudson River in the New York Bay are very strong.  The Hudson River was called *Muh-he-kun-ne-tuk*, the Great Mohegan, by the Iroquois, which translated means "the river that flows both ways."[4]

The Hudson River clearly meets the definition of a "navigable waterway", a fact Defendants concede.

### D.     THE GENERAL CHARACTER OF THE HELICOPTER TOUR GIVING RISE TO THE ACCIDENT BEARS A SIGNIFICANT RELATIONSHIP TO TRADITIONAL MARITIME ACTIVITY.

The second element in determining maritime jurisdiction is whether the general character of the activity giving rise to the accidents bears a significant relationship to traditional maritime activity.  The "relevant 'activity' is not defined

---

[1] American Association of Port Authorities (2008), *Port Industry Statistics*,
[2] NJ.com, "Coast Guard cutters keeping frozen Hudson River shipping lanes open" January 6, 2010.
[3] http://life.bio.sunysb.edu/marinebio/fc.1.estuaries.html
[4] Hoffman, Charles Fenno (1839). *Wild scenes in the forest and prairie (Chapter II: Ko nea rau neh neh or The Flying Head)*. Original from Oxford University. p. 31..

by the particular circumstances of the incident, but by the **general conduct from which the incident arose.**" *Sisson*, 497 U.S. at 364 (emphasis added). In determining whether admiralty law applies, the court is not required to make a finding on the "precise cause" of a particular injury. *Id.* at 365; see also *Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527 (1995). The general conduct from which this incident arose was the transportation of passengers on a helicopter tour of the Hudson River and the surrounding shoreline of Manhattan and New Jersey.

Arguments of the Defendants alleging the Piper aircraft was not engaged in traditional maritime activity is misplaced. "The substantial relationship test is satisfied when at least one alleged tortfeasor was engaging in activity substantially related to traditional maritime activity and such activity is claimed to have been a proximate cause of the incident." *Grubart* at 541.

Plaintiffs were passengers on a tour helicopter that departed and was scheduled to return to the West 30th Street Heliport, located on a pier on the Hudson River, for a tour up and down the Hudson River. Traditionally, this type tour of New York, New Jersey, and the Statue of Liberty was conducted via watercraft. Today, the type of tour, in which Plaintiffs were passengers, is still conducted mainly by boat operators. NYCgo.com, an official New York City guide lists eighteen boat tour operators and only four helicopter tour operators.

The entire route of flight was scheduled to occur over the water. All helicopter arriving or taking off from the West 30th Street Heliport are required to

11

take-off and land over the Hudson River.[5]  The helicopter was scheduled to take off in a westerly direction and turn south over and following the river to the Statue of Liberty, located on Liberty Island.  The only access to Liberty Island is via boat or other watercraft.  After circling the Statue of Liberty, the aircraft was to fly north up the Hudson River to George Washington Bridge and return to the pier again flying over the river.  Prior to the flight, each passenger was provided a flotation device safety vest, which they all were wearing at the time of this accident.  Additionally, upon information and belief the mishap helicopter had inflatable skids for water landing and or ditching.[6]

Defendants' motions to dismiss each rely on *Executive Jet* and the finding of that court that the landing of the wreckage in Lake Erie was "fortuitous and incidental."  The present case is distinguishable from *Executive Jet*, in which the subject aircraft would have flown almost entirely on land.  In the present case, the helicopter's intended flight would have been entirely over a navigable waterway with the exception of takeoff and landing on the pier.  This situation is analogous to a boat loading and unloading at a dock. The collision occurring over the Hudson River and the subsequent impact of both aircraft into the river was not fortuitous but certain.

The Piper aircraft involved in this collision had departed Teterboro Airport in New Jersey and was scheduled to land in Ocean City, New Jersey.  The Piper aircraft was flying on a visual flight rules (VFR) flight plan.  Under VFR, a pilot is

---

[5] Airnav.com.  FAA information for West 30th Street Heliport
[6] NTSB Airworthiness Group Factual Report page 4 of 11, dated December 17, 2009.

allowed to operate an aircraft in weather conditions clear enough so that a pilot may see where he is going.[7]  The pilot must be able to see clearly in order to avoid other traffic, navigate, and control the aircrafts attitude. The Piper's pilot was given the option of two departures out of Teterboro, one to the west and one to the east, which the controller aptly said, "down the river."  The Piper's pilot chose to fly down the river, using the Hudson River for navigation of its intended flight path. Although Defendants' argue the pilot choosing to fly "down the river" was fortuitous, there was a conscious decision made by the Piper's mishap pilot to take that route using the river as navigation.

The Liberty helicopter in which the Gallazzi Plaintiffs were passengers was engaged in "general activity" bearing a significant relationship to maritime activity. The helicopter was conducting a tour of the Hudson River and its surrounding shoreline.  These tours are normally performed by tour boats, each passenger was required to have a safety flotation device on their person, which was provided by Liberty, the helicopter took off from a pier on the Hudson and was scheduled to land back at the pier, the entire path of the flight was scheduled over the river, one of the main attractions was the Statue of Liberty, which is only accessible by boat, and the Piper aircraft involved in the accident was flying under visual flight rules using the Hudson River for navigation.  Even if this court is inclined to discount the flight path of the Piper aircraft, under *Grubart*,  "the substantial relationship test is satisfied when at least one alleged tortfeasor was engaging in activity substantially related to traditional maritime activity and such activity is claimed to have been a

---

[7] Section 91.155 14 CFR Part 91 - General Operating and Flight Rules - FAA

proximate cause of the incident." The Gallazzi Plaintiffs have alleged the proximate cause of the accident is the result of negligence of the helicopter, the Piper, and air traffic control. (*See* Second Amended Complaint) For the above stated reasons, the Gallazzi Plaintiffs have satisfied the second prong demonstrating general character of the activity giving rise to the accident bears a significant relationship to traditional maritime activity.

E.     THE ACCIDENT DID RESULT IN A DISRUPTIVE IMPACT ON COMMERCIAL MARITIME ACTIVITIES.

The *Sisson* Court instructed that lower courts must "assess the general features of the type of incident involved to determine whether such an incident is likely to disrupt commercial activity." *Sisson* at 363. A potential disruptive effect was found in *Foremost*, despite the fact that the collision occurred in waters that were "seldom, if ever, used for commercial traffic." The Court observed that the accident would have disrupted maritime commerce if the collision occurred at the mouth of the St. Lawrence, an area heavily traveled by commercial vessels. *Foremost* at 670 and n.2. In the present case, the collision and subsequent crash into the Hudson River not only had a potential disruptive impact on commercial maritime activities, but an actual disruptive impact on maritime commerce.

Following the mid-air collision, both aircraft crashed into the Hudson River navigation channel.[8] For several days after the crash, the U.S. Coast Guard and the U.S. Army Corps of Engineers, along with various local and federal government agencies assisted in the recovery operation. Due to the recovery efforts, the Coast

---

[8] US Army Corps of Engineers New York District Press Release

14

Guard closed the deep-draft navigation channel of the Hudson River during the recovery period.[9]  Additionally, the Coast Guard set up a safety zone around the recovery operation.  On the night of August 8, 2009, the Coast Guard maintained a two-mile safety zone from the Holland Tunnel to the Lincoln Tunnel, requiring vessels to move slowly and stay within 400 yards of the Manhattan side of the river while passing through the area. The safety zone was maintained by the Coast Guard cutter *Penobscot Bay*.[10]

The controlling law only requires a potential disruptive effect but as shown above the crash resulted in an actual disruptive effect on commercial maritime activities.  As a result of the recovery mission a safety zone was established and the deep-draft navigation channel was closed.

III.   CONCLUSION

The Altman Defendants, Liberty Helicopters and Meridian's motions should be denied and Gallazzi Plaintiffs' request this Court enter an order that general maritime law applies to this case because this tragic accident, the subject of this litigation, meets the criteria for admiralty jurisdiction established by the Supreme Court.  The accident occurred over navigable waters, bears a significant relationship to traditional maritime activity and as a result of the crash, there was an actual disruptive effect on commercial maritime activities.

---

[9] Id.
[10] United States Coast Guard Press Release dated August 8, 2009.

In the alternative, Plaintiffs' request of this court sufficient time to conduct proper discovery of Liberty and Meridian to inquire of their operations and equipment pursuant to the holding *Canavan*.

WHEREFORE, Gallazzi Plaintiffs request Altman Defendants Motion to Dismiss Counts X Through XII of Gallazzi Plaintiffs' Second Amended Complaint for Lack of Subject Matter Jurisdiction and Defendants Liberty Helicopters, Inc.'s and Meridian Consulting I Corporation Inc.'s Motion to Dismiss Admiralty and Maritime Claims Alleged In Second Amended Complaint be denied.

**COLLIER & BASIL P.C.**

By:   s/ Robert Basil
Robert Basil, Esq.
1270 Broadway, Suite 305
New York, NY 10001
Telephone:  (917) 512-3066
Facsimile:  (831) 536-1075
robertjbasil@collierbasil.com

**MOTLEY RICE LLC**

By:   s/ Mary Schiavo
Mary Schiavo, Esq. (*Pro Hac Vice*)
28 Bridgeside Blvd.
P.O. Box 1792 (29465)
Mount Pleasant, SC 29464
Telephone  (843) 216-9138
Facsimile  (843) 216-9440
mschiavo@motleyrice.com

DATED:    January 4, 2011

## CERTIFICATE OF SERVICE

THIS IS TO CERTIFY that on this 4<u>th</u> day of January, 2011, a true and correct copy of <u>Gallazzi Plaintiffs' Response To Altman Defendants Motion To Dismiss Counts X Through XII Of Second Amended Complaint For Lack Of Subject Matter Jurisdiction</u> **And** <u>Gallazzi Plaintiffs' Response To Defendants Liberty Helicopters, Inc.'s  and Meridian Consulting I Corporation, Inc.'s Motion To Dismiss Admiralty And Maritime Claims Alleged In Second Amended Complaint</u>was served on counsel who have entered an appearance in this matter via ECF/CM electronic filing and via email to Counsel on the attached Service List.

**MOTLEY RICE LLC**
By:   <u>s/ Mary Schiavo</u>
     Mary Schiavo, Esq. (*Pro Hac Vice)*

# SERVICE LIST

Steven. J. Riegel, Esq.
Barry F. Benson, Esq.
U.S. DEPARTMENT OF JUSTICE
Civil Division, Torts Branch
PO Box 14271
Washington, DC 20044-4271
Phone:  (202)616-4030
Fax:  (202) 616-4159
Steven.riegel@usdoj.gov
barry.benson@usdoj.gov


Daniel J. Gibbons, Esq.
Assistant U.S. Attorney
OFFICE OF U. S. ATTORNEY
970 Broad Street, Suite 700
Newark, NJ  07102
daniel.gibbons@usdoj.gov

**Attorneys for Defendant**
**United States of America**


Thomas C. Regan, Esq.
Peter B. Van Deventer, Jr., Esq.
Douglas H. Amster, Esq.
Lili Beneda, Esq.
LECLAIR RYAN, P.C.
One Riverfront Plaza
1037 Raymond Blvd.
Newark, NJ 07102
Phone: (973) 491-3600
Thomas.Regan@leclairryan.com
Douglas.amster@leclairryan.com
Peter.vandeventer@leclairryan.com
lili.beneda@leclairryan.com

**Attorneys for Defendants**
**Liberty Helicopters, Inc., and**
**Meridian Consulting I Corporation, Inc.**

Daniel R. Lindemann, Esq.
LINDEMANN, LLC
VIP Office Centre
41 Vreeland Avenue
Totowa, NJ  07512
Phone:  (973) 256-1222
Fax:  (973) 256-1222
drl@lindemann-lw.com

J. Thompson Thornton, Esq.
Patricia A. Leid, Esq.
THORNTON, DAVIS & FEIN, P.A.
80 S.W. 8th Street, Suite 2900
Miami, FL 33130
Tel: (305) 446-2646
Fax: (305) 441-2374
thornton@tdflaw.com
leid@tdflaw.com

**Attorneys for Defendants**
**LCA Partnership, Estate of Steven Altman,**
**David H. Altman, DA Aero, Inc.,**
**Altman Management, Inc.,**
**Altman Management Company II, Inc.**

Richard L. Musat, Esq.
TREECE ALFREY MUSAT & BOSWORTH, PC
999 18th Street, #1600
Denver, CO  80202
Phone:  (303) 292-2700
Fax:  (303) 295-0414
lrmusat@tamblaw.com

**Attorneys for Defendants**
**Liberty Helicopters, Inc., and**
**Meridian Consulting I Corporation, Inc.**

18

David I. Katzman, Esq.
KATZMAN LAMPERT & MCCLUNE
100 W. Big Beaver Road, Suite 130
Troy, MI  48084
Phone:  (248) 258-4800
Fax:  (248) 258-2825
Dikatzman@schadenlaw.com

Gary Potters, Esq.
Michelle L. DeLuca, Esq.
POTTERS & DELLA PIETRA LLP
100 Passaic Avenue
Fairfield, NJ  07004
Phone:  (973) 575-5240
Fax:  (973) 575-4468
gpotters@pdplawfirm.com

*Attorneys for Estate of Steven M. Altman*

Michael Baumeister, Esq.
Dorothea M. Capone, Esq.
Douglas A. Latto, Esquire
BAUMEISTER & SAMUELS, P.C.
One Exchange Plaza
New York, New York 10006
Phone:  (212) 363-1200
Fax:   (212) 363-1346
mbaumeister@baumeisterlaw.com
dcapone@baumeisterlaw.com
dlatto@baumeisterlaw.com

*Attorneys for Jaclyn Altman*

19